**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| **ANDREA CONRAD**<br>712 CONNOLLY FARMS ROAD<br>FALLSTON, MD 21047<br>[Harford County, MD]<br><br>and<br><br>**H.C., a Minor,** by and through her Parent<br>and Next Friend, **ANDREA CONRAD**<br>712 CONNOLLY FARMS ROAD<br>FALLSTON, MD 21047<br>[Harford County, MD]<br><br>        ***Plaintiffs***<br>    v.<br><br>**BALTIMORE LUTHERAN HIGH<br>SCHOOL ASSOCIATION, D/B/A<br>CONCORDIA PREPARATORY SCHOOL**<br>1145 CONCORDIA DRIVE<br>TOWSON, MD 21286<br>[Baltimore County, MD]<br><br>SERVE ON RESIDENT AGENT:<br><br>BRENT JOHNSON<br>521 IDLEWILD ROAD<br>BEL AIR, MD 21014<br><br>  and<br><br>**LUTHERAN CHURCH-MISSOURI<br>SYNOD, INC., D/B/A LUTHERAN<br>CHURCH SOUTHEASTERN DISTRICT**<br>1333 S. KIRKWOOD ROAD<br>SAINT LOUIS, MO 63122<br>[St. Louis County, MO]<br><br>        ***Defendants.*** | **Case No. _____**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

**NOW COME** the Plaintiffs, H.C., a minor, by and through her mother and next friend, Andrea Conrad, and by and through her attorneys, Ketterer, Browne & Anderson, LLC, and brings forth this Complaint against the Defendants, Baltimore Lutheran High School Association d/b/a Concordia Preparatory School and the Lutheran Church-Missouri Synod, Inc., d/b/a Lutheran Church Southeastern District and in support sets forth the following:

## PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this action, Plaintiff H.C. is a minor resident of Harford County, Maryland (hereinafter referred to as "H.C.").

2.      At all times relevant to this action, Plaintiff Andrea Conrad is an adult resident of Harford County, Maryland, and is the mother of the minor Plaintiff H.C.

3.      Plaintiffs H.C. and Andrea Conrad will be referred to collectively as "Plaintiffs".

4.      At all times relevant to this action, Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School (hereinafter referred to as "CPS") is a corporation organized and existing under the laws of the State of Maryland that maintains its principal place of business at 1145 Concordia Drive, Towson, Maryland.

5.      At all times relevant to this action, Defendant Lutheran Church-Missouri Synod, Inc., d/b/a Lutheran Church Southeastern District (hereafter referred to as "LCMS") is a corporation organized and existing under the laws of the State of Missouri that maintains its principal place of business at 1333 S Kirkwood Road, Saint Louis, Missouri.

6.      Defendant CPS and Defendant LCMS will be referred to collectively as "Defendants".

2

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claim asserts a federal question over which this Court has jurisdiction and Plaintiffs asserts state-law claims over which this Court has supplemental jurisdiction.

8.      This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant CPS is domiciled in and conducts business within this judicial district.

9.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

10.      The Northern District is the proper venue per 28 U.S.C. § 100(1).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

11.      H.C. enrolled at CPS as an eighth grade student in the fall of 2019, when she was just thirteen years old.

12.      H.C. was raised in the Christian faith and her faith was very important to her in her formative years.

13.      CPS is an elite, co-educational parochial secondary school serving grades 6-12.

14.      Originally known as Baltimore Lutheran School, CPS is operated by the Baltimore Lutheran High School Association, Inc., an organization of Lutheran churches in the Baltimore area.

15.      Like most Lutheran schools and churches, CPS is overseen by the Lutheran Church–Missouri Synod, the governing body of the Lutheran church.

16.     The Synod is divided into 35 districts, each with its own district president and staff of coordinators and overseers tasked with handling issues within member congregations and schools.

17.     According to CPS's website, the estimated annual cost of attendance for a high school enrollee is over $15,000.

18.     Although H.C. had a variety of options for her middle school education, she and her family chose CPS due to CPS representatives' promises of a safe, tight-knit community and for CPS' lauded "STAR" education program, led by Mrs. Morrie.

19.     CPS representatives told H.C. and her parents that the school offered a caring, closely-knit community in which she would have teachers and administrators looking out for her safety and well-being.

20.     H.C. and her parents believed she would be safe and would thrive at CPS as she had previously in middle school.

21.     H.C.'s parents paid the full tuition and fees for attendance at CPS and did not receive financial aid from CPS. H.C.'s parents paid an additional sum for the STAR program.

## CPS'S HYPER-SEXUALIZED CULTURE

22.     H.C. found CPS to be far from the safe, caring community that she was promised.

23.     At various times during her tenure at CPS, H.C. experienced unwelcome sexual advances from some male students who were emboldened by formal and informal "traditions" and condoned practices at the school.

24.     The concept of CPS students engaging in sexual behavior on CPS property, often during the school day, has long been part of CPS's ethos.

25.     Upon information and belief, one of the frequent venues for sexual behavior on CPS's campus is the visiting sports team's locker room (hereinafter the "Locker Room"), which is largely unused during the school day.

26.     Students would routinely engage in sexual acts, ranging from "making out" to having intercourse, throughout the CPS campus, including empty classrooms, bathrooms, and in the hallways of the school.

27.     The culture of using the Locker Room, the bathrooms, and other locations on the CPS campus as venues for engaging in sexual behavior during the school day was a prevalent part of CPS's culture while H.C. was a student, and was well known to the faculty and administrators.

28.     This hyper-sexualized culture at CPS was fueled in large part by a general consensus that student-athletes – especially male student-athletes, whose athletic programs drew in large alumni donations – were "above the law" and free from recrimination for rule-breaking.

29.     For example, male student-athletes were routinely and categorically exempted or excused from detentions, suspensions, and other disciplinary measures when they conflicted with sports practices and games or would otherwise jeopardize the reputation of a CPS sports program.

30.     As another pertinent example, male student-athletes routinely got away with sexual assault and harassment as CPS consciously ignored incidents.

## CPS'S FAILURE TO PREVENT AND STOP SEXUAL HARASSMENT AND ASSAULT ON ITS CAMPUS

31.     CPS failed to investigate, report, or take any meaningful action to curb instances of sexual harassment and assault on its campus prior to H.C.'s enrollment.

32.     Upon information and belief, other former CPS students, who are still minors, were the victims of sexual assault during their tenure at CPS for which no investigation took place.

33.     One such former student, N.H., a minor, filed a lawsuit against CPS in October 2020 for allegations concerning CPS' lack of proper investigation into sexual assaults that took place on CPS grounds in and around 2018 (Civil Action No. 1:20-cv-03132).

34.     This failure is not surprising given CPS' pattern of ignoring sexual assault and harassment.

35.     CPS was, or should have been, aware that many of its male students routinely used text messaging and social media applications, often during the school day and while using CPS' internet and email servers, to harass female students and request sexual favors to be performed on the CPS campus.

36.     CPS was, or should have been, aware that many of its male students (some of them over the age of 18) used the CPS campus as a venue for forced sexual encounters with female students.

37.     CPS knew or should have known that students used the Locker Room, bathrooms, and other locations on the CPS campus as venues for sexual harassment and/or statutory rape and secured CPS facilities that students used as "hook-up" spots or venues for sexual behavior.

38.     CPS took no significant action to investigate this allegation or any other instances of alleged aggressive sexual behavior by its male students.

39.     CPS took no significant action to prevent high school students from comingling with middle school students during the school day and on the CPS campus.

40.     Similarly, CPS failed to investigate the usage of the Locker Room, bathrooms, and other locations on the CPS campus as venues for sexual encounters, despite readily available means that would have made it possible for CPS to determine which male students were luring female students into the Locker Room for sexual encounters.

41.     Had CPS conducted the careful investigation that was plainly warranted and taken appropriate action, these known instances of sexual assault could have been easily prevented.

42.     CPS' failure to act resulted in, among other harms, H.C.'s sexual assaults in the 2018-2019 academic year as described herein.

### CPS CIRCLES THE WAGONS

43.     Upon information and belief, a female CPS psychologist hired in or around 2017 abruptly left her position with CPS after repeated clashes with CPS Headmaster Brent Johnson, who refused to allow the psychologist to implement mandatory reporting policies for sexual assault cases.

44.     In or around that same year, a group of CPS teachers reported their concerns relating to CPS's treatment of sexual assault and harassment on campus to the CPS school board and/or board of trustees. No action was taken by CPS in response.

45.     Concurrently, this group of teachers raised their concerns about the hyper-sexualized culture at CPS to administrators during monthly "all-faculty meetings", where their concerns were dismissed.

46.     Of note regarding these "all-faculty meetings" is that Ms. Grill, a CPS guidance counselor who upon information and belief routinely dissuaded female students from pursuing sexual assault allegations and who deterred the use of "assault" to describe their experiences, kept the minutes of those meetings along with the school's HR director.

47.     In the midst of this unrest between concerned faculty members and the CPS administration, and in an effort to silence the growing number of reports of assault that came forth from survivors of abuse at CPS during the 2018-2019 academic year, the LCMS dispatched a crisis management team to CPS.

48.     Among the LCMS employees sent to CPS to handle the mounting reports of sexual assault and harassment on campus was Sally Hiller, Executive Director for Congregational Outreach and District Operations for the Southeastern District of LCMS.

49.      Ms. Hiller met with faculty on more than one occasion during the 2018-2019 school year, not in an effort to understand and respond to their concerns, but instead to institute intimidating gag orders and quash the faculty's push for the administration to implement more stringent policies concerning sexual assault and harassment.

50.     Upon information and belief, several members of this cadre of concerned teachers left their jobs at CPS at the conclusion of the 2018-2019 school year in protest of the CPS administration's treatment of sexual assault and harassment issues throughout the school.

## H.C. IS REPEATEDLY HARASSED ON CPS' CAMPUS AND IS LATER ASSAULTED

51.     In or around September of 2019, mere weeks into the start of the school year, H.C. began receiving sexually suggestive text and SnapChat messages from older male CPS students, including a junior male student-athlete, "D.K."

52.     In these messages, which began on September 12, 2019, D.K. repeatedly pressured H.C. to meet him at his vehicle and in the CPS bathrooms to engage in sexual behavior.

53.     H.C. ignored these messages, and in the rare occasion that she did respond, declined D.K.'s advances.

54.     D.K. showed up at H.C.'s home uninvited on or around September 15, 2020, after obtaining her address from H.C.'s SnapChat profile, during which time no sexual activity took place.

55.     H.C.'s mother became aware of these messages, as well as the prevalence of sexual conduct between CPS students on campus, and discussed the matter with CPS' administration.

56.     The CPS administration was dismissive of the problem and did not agree with H.C.'s mother's suggestion that CPS could take proactive steps to address it.

57.     On September 30, 2019, H.C.'s family received a contact submission form on their business's website, in which an unknown individual pretended to be H.C. and referred to her in the third person as H. "Cumrag" and wrote "I want to die" in the message field.

58.     Upon receipt of this alarming message, H.C.'s family consulted their business's IT specialist, who traced the message to a Chromebook computer registered to CPS.

59.     H.C.'s mother called Stephen Berger, director of admissions at CPS, and reported this incident. She followed up with an email on October 1, 2019, in which she forwarded the contact submission form.

60.     In a supplemental email sent on October 1, 2019, H.C.'s mother provided Mr. Berger with a screenshot of relevant information provided by her business's IT specialist, and asked Mr. Berger about CPS' internet provider.

61.     H.C.'s mother sent a follow-up email to Mr. Berger on October 2, 2019.

62.     H.C.'s mother sent an additional follow-up email to Mr. Berger on October 3, 2019.

63.     On October 3, 2019, Mr. Berger responded that "I will be sure to stay in contact about this" issue.

64.     In response to that email, H.C.'s mother stated "I will see you later this afternoon for parent/teacher conferences, so we can touch base then too."

65.     Mr. Berger cancelled his conference with H.C.'s mother after receiving her email.

66.     H.C.'s mother sent another follow-up email on October 8, 2019.

67.     No further information or response was provided to H.C. or her mother regarding this incident.

68.     H.C. continued to receive sexually suggestive messages from D.K. during this time.

69.     H.C. repeatedly blocked D.K. on her texting and social media apps, which resulted in D.K.'s friends approaching her at school demanding to know why she had blocked D.K.

70.     On October 11, 2019, H.C. attended a bonfire and talent show event on the CPS campus, which was open to all CPS students.

71.     H.C. was accompanied by her female friends and had plans to be driven home by one such friend.

72.     At the end of the event, H.C.'s prearranged ride home fell through.

73.     H.C.'s mother suggested that she stay at her grandmother's house, a mere ten minute drive from CPS, rather than try to find a ride back to their home in Fallston at the last minute.

74.     H.C. was reluctant to call her grandmother for a ride, as it was late at night and she feared inconveniencing her elderly grandmother.

75.     As fewer and fewer students remained at CPS as the event attendees left campus, H.C. realized she was without a ride and without options.

76.     D.K., who was in attendance at the CPS event and saw H.C. alone, offered to give her a ride to her grandmother's home.

77.     Two of H.C.'s male acquaintances, boys she knew and trusted, said that they were also being driven home by D.K. and would accompany H.C. on the drive.

78.     H.C. reluctantly accepted D.K.'s offer of a ride on the condition that she would be dropped off before the other two boys.

79.     D.K. insisted that H.C. ride in the front seat of his car.

80.     After the drive commenced, D.K. informed the occupants of his car that he would drop off the boys first and H.C. last.

81.     H.C. became uneasy and texted her best friend that she felt uncomfortable.

82.     H.C.'s cell phone was low on battery and died moments later.

83.     After dropping the boys off, D.K. drove H.C. to a secluded church parking lot.

84.     D.K. parked his car in the parking lot of St. Demetrios Greek Orthodox Church in Parkville, where ironically, H.C.'s family is buried.

85.     D.K. proceeded to sexually assault H.C. for a period of approximately 20 minutes.

86.     D.K. digitally raped H.C. and attempted to coerce her into having intercourse.

87.     H.C. managed to push D.K. off of her and emphatically resisted his pressure to have sex.

88.     Frustrated with H.C.'s refusal to have sex with him, D.K. drove H.C. to her grandmother's house.

89.     H.C. charged her phone and called her best friend to discuss the assault.

90.     On Sunday, November 10, 2019, H.C. and her best friend informed H.C.'s mother of the assault.

91.     On Monday, November 11, 2019, H.C.'s father called D.K.'s father to discuss the incident and expressed his outrage at D.K.'s conduct; he requested that D.K.'s father speak to his son and take responsibility for his actions.

92.     Instead, upon information and belief, D.K. and his parents went to CPS administrators on Monday or Tuesday of that week and reported the allegations against D.K. by H.C. as being completely fabricated.

93.     D.K. and his family presented CPS with statements from the two boys in D.K.'s car on the night of the incident, claiming that H.C. was in fact dropped off first, contradicting H.C.'s story.

94.     CPS did not inform the police or H.C.'s family of this visit or the allegations of sexual assault levied against D.K.

95.     During that week, H.C. informed her trusted teacher, Mrs. Morrie, of the assault. Upon information and belief, Mrs. Morrie reported the incident to Mr. Johnson. It is worth noting that upon information and belief, Mrs. Morrie no longer works for CPS and was met with a punitive response for reporting H.C.'s allegations.

96.     In the middle of that same week, H.C.'s family called a meeting with CPS administrators to discuss the assault.

97.     CPS Headmaster Brent Johnson informed H.C. and her family that CPS would not proceed with any investigation or action involving D.K. unless criminal charges were brought against him.

98.     H.C.'s parents called the police and reported the assault.

99.    D.K. was arrested in September 2020 following a police investigation.

100.    Criminal charges for second-degree rape and sexual assault were filed against D.K., which remain pending (Case No. D-08-CR-20-001286).

101.    In the course of the state's investigation of the assault, the two boys who rode in D.K.'s car on the night of the incident told the truth to police and corrected their prior statements concerning the order in which they and H.C. were dropped off.

102.    After the charges were filed, H.C.'s mother called CPS to inform them of the charges and the pending police investigation.

103.    CPS took no action to discipline D.K., who was allowed to remain on the CPS campus for almost a year after the incident and before his arrest, or the two male students who lied to CPS about being dropped off before H.C.

104.    Upon information and belief, D.K. was never disciplined by CPS in any manner connected to the assault, but instead elected of his own volition to complete his high school education elsewhere.

105.    H.C. disclosed her sexual assaults and harassment to CPS administrators who failed to report the sexual assault to state or local authorities, failed to conduct a thorough investigation, failed to do anything to stop the ongoing sexual assaults and harassment, and failed to offer H.C. *any* accommodations based on the sexual harassment and assaults she had reported.

106.    CPS and LCMS failed to make any report to state or local authorities, failed to conduct a thorough investigation, and failed to offer H.C. any accommodations for the sexual assaults and harassment that she had experienced on CPS' campus.

107.    Upon information and belief, these issues continue to pervade the CPS campus.

## H.C. IS TREATED LIKE A PROBLEM, NOT A SURVIVOR

108.    After reporting the assault to CPS, it became apparent to H.C. and her mother that the administrators were skeptical of H.C.'s reports and sought only to protect D.K. from any further gossip, speculation, and most of all, discipline.

109.    No disciplinary action was taken with respect to D.K.

110.    No support or accommodations were ever offered to H.C. by CPS.

111.    During this time, H.C. and her mother came to realize that H.C. would have to attend a different high school for her own safety and well-being.

112.    Overwhelmed by trauma and CPS' failure to do anything about it, H.C. began to exhibit symptoms of anxiety and depression.

113.    Despite her religious upbringing, H.C. experienced a crisis of faith as a result of being assaulted next to the cemetery where her family is buried.

114.    Based on her experience at CPS, H.C.'s parents decided not to enroll H.C. in the school for the following year, which resulted in H.C. having to adjust to a new environment while still processing the sexual assault that occurred months earlier.

115.    Due to the severity of her emotional distress stemming from her encounters of sexual assault at CPS, the sexually hostile environment at CPS, and the treatment she received from administrators at CPS and LCMS, H.C. was forced to undergo mental health treatment.

## CAUSES OF ACTION

### COUNT I – *Violation of 20 U.S.C. § 1681, et. seq.*
*Title IX of the Education Amendments Act*

**Against Defendant CPS**

116.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

117.    During the relevant timeframe, Defendant CPS was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

118.    Defendant exercised substantial control over the students who assaulted H.C. and over the boys who harassed her.

119.    All the events giving rise to this claim occurred on CPS' grounds.

120.    In or about October 2019, H.C. faced severe discrimination based on sex when she was sexually harassed and assaulted, verbally and physically on school grounds by CPS students. The sexual assaults and harassment H.C. endured were sufficiently severe, pervasive, and objectively offensive to constitute a hostile educational environment for her at CPS.

121.    Defendant CPS was on actual notice of the sexual assaults committed on H.C. and the hypersexual hostile environment that existed at the school during H.C.'s time there.

122.    Despite being on actual notice of the assaults on and harassment of H.C., Defendant CPS failed to take meaningful action to investigate the assault and/or to protect H.C. from retaliation on the part of faculty, staff, and fellow students regarding H.C.'s attempts to seek out a safe educational environment.

123.    Defendant CPS acted with deliberate indifference to the complaints and other notice regarding the ongoing hostile education environment, ongoing threats, bullying, and retaliation faced by H.C. after reporting that she was sexually assaulted.

124.    The hostile educational environment at CPS effectively barred H.C.'s access to educational opportunities and benefits because she was forced to leave CPS due to the continuing hostile environment at the school and due to ongoing bullying and retaliation at the school.

125.    In addition to the foregoing violations of Title IX, Defendant CPS violated its Title IX obligations by:

a.  Failing to have a Title IX coordinator or any other person to receive complaints about gender-based discrimination, harassments, and/or assaults;

b.  Failing to have any policy for a student's reporting of sexual harassment and/or sexual assault;

c.  Failing to have a program for prevention of sexual harassment and sexual assault;

d.  Failing to have a program or policy for investigating sexual harassment or sexual assault;

e.  Failing to have a program or policy for offering accommodations to victims of sexual assault;

f.  Failing to have a program or policy for preventing retaliation against those who report sexual harassment and/or sexual assault;

g.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

h.  Retaliating against H.C. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

126.    As a direct and proximate cause of Defendant CPS' violation of Title IX, H.C. has been deprived of educational opportunities and benefits that delayed her academic attainment during her high school education and thereafter. This deprivation was the result of Defendant's deliberate indifference to the hostile educational environment at CPS.

127.    As a direct and proximate cause of Defendant CPS' violation of Title IX, H.C. has experienced and will likely continue to experience severe emotional distress accompanied by objective physical manifestations and/or symptoms (such as nausea, vomiting, elevated heart

rate, sweating, nightmares, night terrors, and inability to sleep), loss of functioning, loss of earning potential, medical bills, and other pecuniary harms to be established at trial.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

<u>**COUNT II –** *Negligent Supervision and Retention*</u>

**Against Defendant CPS and Defendant LCMS**

128.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

129.    Defendants had a fiduciary relationship with H.C. as both a student and minor under the age of 18.

130.    As a Maryland educational institution, Defendant CPS owed H.C. a special duty of trust and confidence to ensure her safety and well-being.

131.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, and Defendant LCMS breached their duty owed to H.C. by, among other things:

    a.    Failing to properly protect H.C., then a minor, from sexual abuse and harassment;

    b.    Improperly protecting H.C., then a minor, from sexual abuse and harassment;

    c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.    Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.   Failing to promptly report H.C.'s sexual assaults to the authorities;

h.   Failing to take any action to prevent retaliation against H.C. after her assaults were reported to CPS;

i.   Failing to conduct an exit interview with H.C. when she left the school;

j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against H.C. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

132.   Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for H.C. to be sexually assaulted and harassed and that the lack of protocols for which incidents of sexual assault were reported were woefully insufficient.

133.   Defendants failed to provide adequate training, monitoring, and supervision of its administrators, faculty, and/or staff concerning reports of sexual assault.

134.    Defendants carelessly and recklessly failed to supervise its male students, even after specific complaints of sexual assault and harassment had been lodged against them by various students, including H.C..

135.    Defendants failed to implement training and monitoring mechanisms by which sexual assaults such as those suffered by H.C. could have been prevented, or at the very least, appropriately reported to parents and law enforcement authorities.

136.    Defendants' conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

137.    As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, H.C. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

138.    As a direct and proximate result of Defendants' negligence, H.C. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT III – *Negligence*

**Against Defendant CPS and Defendant LCMS**

139.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

140.    In the fall of 2019, H.C. enrolled at CPS and was thereby deprived of the protection of her parents while on school grounds and during the school day.

141.    Upon H.C.'s enrollment, Defendant CPS assumed custody of her and other students while on the school's premises.

142.    In so doing, Defendant CPS entered into a relationship with H.C. that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect H.C. from reasonably foreseeable harm.

143.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, breached their duty owed to H.C. by, among other things:

    a.  Failing to properly protect H.C., then a minor, from sexual abuse and harassment;

    b.  Failing to identify and eliminate, minimize, and/or address known and foreseeable risks of physical and emotional injury;

    c.  Improperly protecting H.C., then a minor, from sexual abuse and harassment;

    d.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    e.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    f.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks,

Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

h.  Failing to promptly report H.C.'s sexual assaults to the authorities;

i.  Failing to take any action to prevent retaliation against H.C. after her assaults were reported to CPS;

j.  Failing to conduct an exit interview with H.C. when she left the school;

k.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

l.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

m.  Retaliating against H.C. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

144.  Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for H.C. to be sexually assaulted and harassed.

145.  Defendants' conduct was wanton, malicious, or oppressive in that Defendants disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

146.  As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, H.C. has experienced and will likely continue to experience severe emotional distress

accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

147.    As a direct and proximate result of Defendants' negligence, H.C. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT IV – *Premises Liability*

### Against Defendant CPS

148.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

149.    While on CPS' premises, H.C. was a business invitee of Defendant CPS.

150.    Defendant CPS owed H.C. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

151.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect H.C. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

    a.   Failing to properly protect H.C., then a minor, from sexual abuse and harassment;

    b.   Improperly protecting H.C., then a minor, from sexual abuse and harassment;

c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report H.C.'s sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against H.C. after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with H.C. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against H.C. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

152.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for H.C. to be sexually assaulted and harassed.

153.    Defendant CPS' conduct was wanton, malicious, or oppressive in that Defendant CPS disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

154.    As a direct and proximate cause of Defendant CPS' violation of its fiduciary duty to her, H.C. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

155.    As a direct and proximate result of Defendant CPS' negligence, H.C. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT V – *Intentional Infliction of Emotional Distress*

### Against Defendant CPS and Defendant LCMS

156.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

157.    While on CPS' premises, H.C. was a business invitee of CPS.

158.    Defendants owed H.C. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

159.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect H.C. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

    a.   Failing to properly protect H.C., then a minor, from sexual abuse and harassment;

    b.   Improperly protecting H.C., then a minor, from sexual abuse and harassment;

    c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

    g.   Failing to promptly report H.C.'s sexual assaults to the authorities;

    h.   Failing to take any action to prevent retaliation against H.C. after her assaults were reported to CPS;

     i.   Failing to conduct an exit interview with H.C. when she left the school;

     j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

     k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

     l.   Retaliating against H.C. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

160.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for H.C. to be sexually assaulted and harassed.

161.    Defendants' conduct was extreme and outrageous, and it intentionally or recklessly caused H.C. severe emotional distress.

162.    Defendants' conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

163.    Defendants purposefully intended to cause or recklessly disregarded the high probability of causing a disturbance of H.C.'s emotional tranquility that was so severe that harmful physical consequences resulted.

164.    As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, H.C. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

165.    As a direct and proximate result of Defendants' negligence, Plaintiff H.C. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT VI – *Negligent Infliction of Emotional Distress*

### Against Defendant CPS and Defendant LCMS

166.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

167.    Defendants had a duty to H.C. to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

168.    To the extent Defendants' conduct is not found to be reckless and/or intentional, the conduct is—at the very least—negligent.

169.    Defendants' negligent acts include, but are not limited to:

a.    Failing to properly protect H.C., then a minor, from sexual abuse and harassment;

b.    Improperly protecting H.C., then a minor, from sexual abuse and harassment;

c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.  Failing to investigate, prohibit, and/or otherwise address the formation or the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report H.C.'s sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against H.C. after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with H.C. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against H.C. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

170.   As a direct and proximate cause of Defendants' malfeasance and nonfeasance, H.C. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

171.    As a direct and proximate result of Defendants' negligence, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues in this action so triable.

Dated: <u>November 6, 2020</u>                    Respectfully submitted,

                         /s/ Justin Browne
                        Justin Browne (Bar No. 29164)
                        Christina Graziano (*pro hac vice* to be filed)
                        KETTERER, BROWNE & ANDERSON, LLC
                        336 S. Main Street
                        Suite 2A-C
                        Bel Air, MD 21014
                        Phone: (855) 522-5297
                        Fax: (855) 334-5626
                        Justin@KBAAttorneys.com
                        Christina@KBAAttorneys.com