## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| | * | |
| Defendant. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| | * | |
| Defendant. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * | |
| | * | |
| | * | |

SOUTHEASTERN DISTRICT,

                      *

    Defendants.

*   *   *   *   *   *   *   *   *   *   *   *   *

ARIANA GOMEZ,              *

    Plaintiff,             *          Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH   *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY     *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,           *
SOUTHEASTERN DISTRICT,
                      *

    Defendant.

*   *   *   *   *   *   *   *   *   *   *   *   *

SELENA BARBER, *et al.*,     *

    Plaintiffs,           *          Civil Action No. RDB-21-0691

    v.                    *

BALTIMORE LUTHERAN HIGH   *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY     *
SCHOOL,
                      *

    Defendants.

*   *   *   *   *   *   *   *   *   *   *   *   *

## <u>MEMORANDUM OPINION</u>

These five cases are brought by five different women, all former students of Concordia

Preparatory School, previously known as Baltimore Lutheran High School, who make identical

allegations of sexual assault and verbal sexual harassment by male students at the school dating

back to 2016. They allege that the school failed to adequately address their numerous

complaints or take any meaningful action and, indeed, cultivated a "hyper-sexualized culture" at the school. In these series of cases, three minors, N.H., H.C., and A.G., through their respective mothers, Donna Buettner-Hartsoe, Andrea Conrad, and Selena Barber, and two adults, Jennifer Pullen and Ariana Gomez (collectively, "Plaintiffs"), bring federal and state claims against Defendant Baltimore Lutheran High School Association, now doing business as Concordia Preparatory School ("CPS"), and Defendant Lutheran Church-Missouri Synod, Southeastern District ("LCMS").[1] Both Defendants have filed a series of Motions to Dismiss these cases. These defense motions shall be generally DENIED.

In each of these cases, Plaintiffs allege a violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.* (Count I); negligent supervision and retention (Count II); negligence (Count III); premises liability (Count IV); intentional infliction of emotional distress (Count V); and negligent infliction of emotional distress (Count VI)[2]. (Case No. RDB-20-3132, Compl., ECF No. 1; Case No. RDB-20-3214, Compl., ECF No. 1; Case No. RDB-20-3229, Am. Compl., ECF No. 24; Case No. RDB-20-3267, Am. Compl., ECF No. 26.) Only Plaintiff H.C., through her mother Andrea Conrad, and Plaintiff Gomez bring claims against Defendant Lutheran Church-Missouri Synod on Counts II, III, V, and VI.[3] (*See* Case No. RDB-20-3229, Am. Compl., ECF No. 24; Case No. RDB-20-3267, Am. Compl., ECF No. 26; Case No. RDB-21-0691, Compl., ECF No. 1.) For the reasons

---

[1] On May 18, 2021 all of these cases were assigned to the undersigned Judge. By Separate Order, these cases shall be consolidated for purposes of discovery and motions.

[2] In their respective Opposition briefs, Plaintiffs withdraw their claims for negligent infliction of emotional distress (Count VI). *See infra.*

[3] On December 30, 2020, Plaintiff Jennifer Pullen dismissed with prejudice her claims against Defendant LCMS. (Case No. RDB-20-3214, ECF Nos. 19, 20.) Plaintiffs N.H. and A.G., through their mothers Donna Buettner-Hartsoe and Selena Barber, never filed suit against LCMS. (*See* Case No. RDB-20-3132; Case No. RDB-21-0691.)

that follow, the Motions of CPS to Dismiss the Title IX, negligent supervision, negligence, and intentional infliction of emotional distress claims of all five Plaintiffs set forth in Counts I, II, III, and V, are DENIED. Similarly, the Motions of LCMS to Dismiss negligent supervision and negligence claims of two of the Plaintiffs, set forth in Counts II and III, are DENIED. Pursuant to a Separate Scheduling Order to follow, discovery shall proceed in these cases.

The following Motions are presently pending in these cases: Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts II, IV, V, and VI (Case No. RDB-20-3132, ECF No. 34); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts II, IV, V, and VI (Case No. RDB-20-3214, ECF No. 36); Defendant LCMS's Motion to Dismiss (Case No. RDB-20-3229, ECF No. 37); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts I, II, IV, V, and VI (Case No. RDB-20-3229, ECF No. 38); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts I, II, IV, V, and VI (Case No. RDB-20-3267, ECF No. 79); Defendant LCMS's Motion to Dismiss (Case No. RDB-20-3267, ECF No. 80); and Defendant CPS's Motion to Dismiss for Failure to State a Claim as to Counts I, II, IV, V, and VI (Case No. RDB-21-0691, ECF No. 9).

The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts II, IV, V, and VI (Case No. RDB-20-3132, ECF No. 34); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts II, IV, V, and VI (Case No. RDB-20-3214, ECF No. 36); Defendant LCMS's Motion to Dismiss (Case No. RDB-20-3229, ECF No. 37); Defendant CPS's Motion for Judgment on the

Pleadings with Regard to Counts I, II, IV, V, and VI (Case No. RDB-20-3229, ECF No. 38); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts I, II, IV, V, and VI (Case No. RDB-20-3267, ECF No. 79); Defendant LCMS's Motion to Dismiss (Case No. RDB-20-3267, ECF No. 80); and Defendant CPS's Motion to Dismiss for Failure to State a Claim as to Counts I, II, IV, V, and VI (Case No. RDB-21-0691, ECF No. 9) are generally DENIED, but GRANTED IN PART as to some claims. Specifically, Count V (intentional infliction of emotional distress) in Case Numbers RDB-20-3229 and RDB-20-3267 is DISMISSED WITH PREJUDICE AS TO DEFENDANT LCMS ONLY; and Counts IV (premises liability) and VI (negligent infliction of emotional distress) are DISMISSED WITH PREJUDICE in all five cases. The remaining motions are denied and this case shall proceed with respect to Counts I, II, III, and V against the Defendant CPS, and Counts II and III against the Defendant LCMS.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

The Plaintiffs in these cases comprise three minor women, N.H., H.C., A.G., their mothers, Donna Buettner-Hartsoe ("Ms. Buettner-Hartsoe"), Andrea Conrad ("Ms. Conrad"), and Selena Barber ("Ms. Barber"), and two adult women, Jennifer Pullen ("Ms. Pullen") and Ariana Gomez ("Ms. Gomez"). (Case No. RDB-20-3132, Compl. ¶¶ 9-36, ECF No. 1; Case No. RDB-20-3214, Compl. ¶¶ 9-47, ECF No. 1; Case No. RDB-20-3229, Am.

Compl. ¶¶ 11-50, ECF No. 24; Case No. RDB-20-3267, Am. Compl. ¶¶ 10-48, ECF No. 26; Case No. RDB-21-0691, Compl. ¶¶ 9-62, ECF No. 1.) Plaintiffs N.H., H.C., A.G., Ms. Pullen, and Ms. Gomez are all former students of Defendant Concordia Preparatory School ("CPS"). (*Id.*) CPS, originally known as Baltimore Lutheran High School, is a co-educational parochial secondary school for grades 6 through 12. (*Id.*) CPS is operated by the Baltimore Lutheran High School Association, Inc., which is an organization of Lutheran churches in the Baltimore area. (*Id.*) In addition, CPS is overseen by the regional Southeastern District of the Lutheran Church – Missouri Synod ("LCMS"), which is the governing body of the Lutheran Church. (*Id.*)

Plaintiffs allege that CPS has cultivated a "hyper-sexualized culture" since at least 2016 and that "the concept of CPS students engaging in sexual behavior on CPS property, often during the school day, has long been part of CPS's ethos." (*Id.*) Each individual Plaintiff alleges she has experienced some form of unwelcome sexual conduct by male students at CPS, ranging from verbal sexual harassment to rape. They assert that CPS has consistently failed to investigate, report, or take any meaningful action to address incidences of sexual harassment and assault on its campus. This failure, Plaintiffs allege, resulted in multiple sexual assaults that are the subject of Plaintiffs' respective cases, and which are described in further detail below.

## I. General Allegations against CPS

In or around 2017, Plaintiffs allege that a female psychologist abruptly left her position at CPS after CPS's Headmaster, Brent Johnson, refused to allow the psychologist to implement mandatory reporting policies for sexual assault cases. (Case No. RDB-20-3214,

Compl. ¶¶ 40-47, ECF No. 1; Case No. RDB-20-3229, Am. Compl. ¶¶ 43-50, ECF No. 24; Case No. RDB-20-3267, Am. Compl. ¶¶ 41-48, ECF No. 26; Case No. RDB-21-0691, Compl. ¶¶ 51-62, ECF No. 1.) The same year, Plaintiffs also allege that a group of CPS teachers, including Plaintiff Ms. Pullen's mother, went to CPS administration to complain about the sexual assault and harassment occurring on the campus. (*Id.*) This group of teachers also allegedly raised their concerns at the all-faculty meetings. These concerns were allegedly dismissed by CPS administration and no action was taken in response. (*Id.*)

During the 2018-2019 academic year, Defendant LCMS allegedly dispatched a "crisis management team" to CPS to address the growing number of sexual assault allegations at the school. (*Id.*) This team included Sally Hiller, LCMS's Executive Director for Congregational Outreach and District Operations. (*Id.*) Plaintiffs allege that Ms. Hiller met with faculty during the 2018-2019 school year "to institute intimidating gag orders and quash the faculty's push for the administration to implement more stringent policies concerning sexual assault and harassment." (*Id.*) Several faculty members allegedly left their positions at CPS after that school year "in protest" over the administration's treatment of sexual assault and harassment issues at the school. (*Id.*)

## II.     Plaintiff N.H.

Plaintiff minor N.H., through her mother, Ms. Buettner-Hartsoe, alleges that she enrolled at CPS in the fall of 2017, when she was fourteen years old. (Case No. RDB-20-3132, Compl. ¶¶ 1, 2, 9, 10, ECF No. 1.) In or around January 2018, N.H. allegedly began a friendship with a CPS classmate, "John." (*Id.* ¶ 38.) She alleges that John engaged in a series of non-consensual sexual acts with her, including filming a FaceTime call with N.H. in which

N.H. masturbated ("the video"). (*Id.* ¶ 39.) N.H. maintains she did not consent to being filmed nor did she consent to dissemination of the video. (*Id.* ¶ 40.)

However, N.H. alleges that, without her knowledge or consent, the video was circulated around the school via the iPhone method of "Air Drop," which allows users to share and download files. (*Id.* ¶ 41.) Within weeks, N.H. alleges the video had circulated throughout the student body and to CPS administrators and teachers. (*Id.* ¶ 42.) CPS's guidance counselor, Ms. Grill[4], held a meeting with N.H. about "rumors" she had heard about N.H., but Ms. Grill did not inform N.H.'s parents about the video. (*Id.* ¶ 43.) The student who allegedly disseminated the video was later expelled for having drugs on campus and not for any sexual misconduct with N.H. (*Id.* ¶¶ 57-58, 68.)

N.H. alleges she began receiving threatening phone calls from two male CPS students, "demanding that she perform oral sex and engage in other sexual acts with them" or else they would post the Video and other photos and videos of her to various social media accounts, including SnapChat and Instagram. (*Id.* ¶¶ 45-46.) In or around February 2018, a male student-athlete at CPS, "C", allegedly stuck his hand up N.H.'s skirt during class. (*Id.* ¶¶ 49-50.) N.H. immediately left the classroom and informed the assistant principal, Mr. Miller, who N.H. alleges took no action. (*Id.* ¶ 50.) She also informed Ms. Grill, who also allegedly took no action. (*Id.* ¶ 51.) N.H. alleges that "C" continued to verbally and physically harass N.H. at school. (*Id.* ¶ 52.)

---

[4] Plaintiff N.H.'s Complaint references a "Ms. Gill," but Defendant CPS asserts, and Plaintiff does not object, that Ms. Gill's name is "Ms. Grill."

On or about April 13, 2018, N.H. alleges she was sexually assaulted by a group of male CPS students, including "C." (*Id.* ¶¶ 53-54.) She was lured to the locker room after her track practice by a senior CPS student who wanted to "make out" with her. (*Id.*) The senior student pressured N.H. to perform oral sex on him and then he allegedly told her to walk to the back of the locker room. (*Id.*) A group of male CPS students were waiting in the back of the locker room and allegedly pushed N.H. to the back of the room and turned out the lights. (*Id.*) While several of the students "barricaded" the door, one of the students "bear hugged" N.H. and dragged her to the back wall. (*Id.*) N.H. alleges that "C" groped her from behind, attempted to digitally rape her, and rubbed her hand against his erect penis. (*Id.*) N.H. repeatedly told the students to stop and attempted to escape "C's" grip. (*Id.*) Another CPS student who was also in the locker room allegedly intervened and helped N.H. escape. (*Id.*) On or about April 14, 2018, N.H. and her sister reported the incident to CPS administrators, but N.H. alleges that the school failed to take any action and did not contact N.H.'s parents. (*Id.* ¶ 56.)

Also in or around April 2018, N.H. alleges that "C" approached her while she was seated in the library, screamed at her, called her a "stupid bitch," and threw her personal items on the ground. (*Id.* ¶ 60.) She also reported this incident to CPS administration, but no action was taken. (*Id.*)

As a result of N.H.'s experience at CPS, she alleges that she began to experience anxiety and depression and has undergone mental health treatment to process the trauma of the assault. (*Id.* ¶¶ 64-66, 77.) In addition, N.H. alleges that she began to engage in self-harming behavior. (*Id.* ¶¶ 66, 75.) N.H. initially transferred to a new school after CPS, but alleges that

rumors about her from CPS pervaded her new school, prompting her to finish her high school education at home.  (*Id.* ¶¶ 78-79.)

### III.    Plaintiff Pullen

Plaintiff Ms. Pullen was twelve years old in 2014 when she enrolled at CPS as a seventh-grade student.  (Case No. RDB-20-3214, Compl. ¶ 9, ECF No. 1.)  Her mother also began teaching at CPS in 2014.  (*Id.* ¶ 10.)  In or around the fall of 2018, when Ms. Pullen was in eleventh grade, she alleges that members of the boys' soccer team began to verbally harass her on campus after she broke up with her boyfriend who was on the soccer team.  (*Id.* ¶¶ 48-49.) The male students would allegedly make comments to Ms. Pullen, within earshot of faculty members, expressing a desire to have sex with her or describing her body as being "ripe for sexual intercourse and sexual favors."  (*Id.* ¶¶ 51-52.)  In addition, these students allegedly made sexually explicit gestures to Ms. Pullen, including "stretching their mouths wide open to simulate a woman giving oral sex onto a male's anatomy."  (*Id.* ¶ 53.)  They made these lewd gestures towards Ms. Pullen while at volleyball and football games where Ms. Pullen was participating as a member of the cheerleading team.  (*Id.* ¶ 56.)

Ms. Pullen continuously reported this alleged harassment to her teacher and cheerleading coach, Sue Welinsky, who told Ms. Pullen she would take care of it and that "everything would be fine."  (*Id.* ¶¶ 57-58.)  Ms. Pullen alleges Ms. Welinsky took no action in response to these reports.  (*Id.* ¶ 59.)  Ms. Pullen also alleges that, around this same time, a football player named "C" would refer to Ms. Pullen as a "pound cake," which she alleges was a "crude insinuation of his desire to have sex with" her.  (*Id.* ¶ 60.)  She alleges that "C" would make these comments in front of Ms. Pullen herself and in front of Ms. Pullen's mother, who

was also C's teacher. (*Id.*) He would also allegedly make these comments in front of another teacher, Mr. Genszler, who Ms. Pullen alleges took no action in response to hearing them. (*Id.* ¶ 61.) Ms. Pullen and her mother did report C's harassment to CPS's Headmaster, Brent Johnson, who allegedly told them to "leave it alone" and discouraged Ms. Pullen from reporting further conduct. (*Id.* ¶¶ 62-63.)

In or around March 2019, during two different occasions in anatomy class, Ms. Pullen alleges that two of the male soccer players sexually assaulted her by using their bodies to shield her desk and putting their hands up her skirt. (*Id.* ¶ 65.) In or around late March 2019, during math class, another male soccer player allegedly grabbed Ms. Pullen's arm and forced her hand against his clothed penis. (*Id.* ¶ 69.) Ms. Pullen alleges she told Ms. Welinsky about the assault the same day and another male student witnessed the assault and later corroborated Ms. Pullen's report to CPS administrators. (*Id.* ¶¶ 70-72.) Following her report, Ms. Pullen was called to the administration offices every day for a week, where she was questioned by Mr. Johnson and Ms. Grill, CPS's guidance counselor. (*Id.* ¶¶ 73-74.) Ms. Pullen alleges that, after this week of questioning, she and her mother believed that the administrators were skeptical of Ms. Pullen's reports and sought to protect the assailants from discipline. (*Id.* ¶ 80.) Ms. Pullen maintains that no disciplinary action was taken with respect to any of the alleged assailants. (*Id.* ¶ 83.)

Following the incident, Ms. Pullen alleges she was informed by CPS administrators that she had received a one-day suspension for jeopardizing the soccer players' college athletics scholarships. (*Id.* ¶¶ 86-87.) CPS Headmaster Brent Johnson allegedly warned Ms. Pullen and her mother that if they continued to speak out about her experience or pursue discipline

of the soccer players, he would inform the new school to which Ms. Pullen intended to transfer of her suspension, thereby threatening her admission to the transfer school. (*Id.* ¶ 88.) As a result of Ms. Pullen's experience at CPS, she alleges that she began to experience anxiety and depression and has undergone mental health treatment to process the trauma of the assault. (*Id.* ¶¶ 90-92.) In addition, she asserts she gave up on her dreams of attending a four-year college in Florida to stay close to home and to be "safe from unknown people and places." (*Id.* ¶ 93.)

### IV.     Plaintiff H.C.

Another minor, H.C., through her mother, Ms. Conrad, also alleges that she was sexually assaulted by another CPS student and experienced sexual harassment, for which CPS and LCMS failed to take any action. (Case No. RDB-20-3229, Am. Compl. ¶¶ 1, 2, ECF No. 24.) H.C. enrolled at CPS in the fall of 2019 when she was thirteen years old. (*Id.* ¶ 11.) At the beginning of the school year, on or about September 12, 2019, H.C. alleges that she began receiving sexually suggestive text and SnapChat messages from older male CPS students, including a male student referred to as "D.K." (*Id.* ¶ 51.) In D.K.'s messages, he allegedly pressured H.C. to meet him at his car and in the CPS bathrooms to engage in sexual acts. (*Id.* ¶ 52.) H.C. alleges she either did not respond or declined D.K.'s advances. (*Id.* ¶ 53.) On or about September 15, 2020, H.C. asserts that D.K. showed up at her home uninvited. (*Id.* ¶ 54.)

Ms. Conrad apparently became aware of the messages sent to her daughter and discussed her concerns with CPS's administration. (*Id.* ¶ 55.) Plaintiffs allege that the CPS administration was dismissive of Ms. Conrad's concerns and did not agree that CPS could take

proactive steps to address them. (*Id.* ¶ 56.) On or about September 30, 2019, H.C's family allegedly received a contact submission form on their business website, in which an unknown individual pretended to be H.C., referring to H.C. as H. "Cumrag" and writing "I want to die" in the message field. (*Id.* ¶ 57.) Plaintiffs allege that their family business traced the message to a Chromebook computer registered to CPS. (*Id.* ¶ 58.) Shortly thereafter, Ms. Conrad called CPS's Director of Admissions, Stephen Berger, to report the incident, and followed up with four separate emails providing the relevant information about the incident. (*Id.* ¶¶ 59-62.) On or about October 3, 2019, Mr. Berger responded that he would "be sure to stay in contact about this." (*Id.* ¶ 63.) However, when Ms. Conrad responded that she would address the issue later that afternoon with him during a parent/teacher conference, Mr. Berger allegedly cancelled the conference. (*Id.* ¶¶ 64-65.) Ms. Conrad sent another follow-up email on or about October 8, 2019, but received no further response from Mr. Berger or CPS administration. (*Id.* ¶¶ 66-67.) During this time, D.K. allegedly continued to send H.C. sexually suggestive messages and H.C. alleges she repeatedly blocked D.K. on her texting and social media applications, resulting in D.K.'s friends approaching her at school asking why she had blocked D.K. (*Id.* ¶¶ 68-69.)

On or about October 11, 2019, H.C. attended a bonfire and talent show at CPS with her female friends. (*Id.* ¶¶ 70-71.) When H.C.'s pre-arranged ride home fell through, D.K. offered to give H.C. a ride home to her grandmother's house. (*Id.* ¶¶ 72-76.) H.C. alleges she reluctantly accepted the offer on the condition that she would be dropped off before two other boys also getting a ride home from D.K., boys whom H.C. knew and trusted. (*Id.* ¶¶ 77-78.) During the ride, D.K. allegedly announced that the two boys would be dropped off

first, which made H.C. "uneasy." (*Id.* ¶¶ 80-81.) H.C. alleges she texted her best friend that she was uncomfortable, but her phone battery was low and died moments later. (*Id.* ¶¶ 81-82.) After D.K. dropped the two boys off, he allegedly drove to a secluded church parking lot and proceeded to sexually assault H.C. for approximately 20 minutes, including digitally raping H.C. and attempting to force her to have intercourse with him. (*Id.* ¶¶ 83-86.) H.C. alleges she pushed D.K. off her and D.K eventually drove her to her grandmother's house. (*Id.* ¶¶ 87-88.) H.C. alleges she called and told her best friend about the assault after she got home and charged her phone. (*Id.* ¶ 89.)

On or about November 10, 2019, H.C. and her best friend informed H.C.'s mother, Ms. Conrad, of the assault. (*Id.* ¶ 90.) On or about November 11, 2019, H.C.'s father called D.K.'s father to tell him about the assault. (*Id.* ¶ 91.) The same day or the day after, D.K. and his parents allegedly went to CPS administrators to report that the allegations against D.K. were "completely fabricated." (*Id.* ¶ 92.) They allegedly presented CPS with statements from the two boys who rode in the car with H.C. and D.K. who claimed that H.C. was dropped off first, thereby contradicting H.C.'s allegations. (*Id.* ¶ 93.) Plaintiffs allege that CPS did not inform the police or H.C.'s family of D.K. and his family's visit or of the sexual assault allegations against D.K. (*Id.* ¶ 94.) Later that week, H.C.'s family scheduled a meeting with CPS administrators to discuss the assault. (*Id.* ¶ 96.) CPS's Headmaster, Brent Johnson, allegedly told H.C. and her family that CPS would not proceed with an investigation involving D.K. unless criminal charges were brought against him. (*Id.* ¶ 97.) As a result, H.C.'s parents called the police and reported the assault. (*Id.* ¶ 98.) While the State investigated the assault, Plaintiffs allege that CPS took no disciplinary action against D.K and offered no support or

accommodations to H.C.  (*Id.* ¶¶ 108-110.)  Also during the investigation, Plaintiffs allege that the two boys who rode in D.K.'s car on the night of the incident corrected their prior statements, acknowledging that they were both dropped off before H.C. that night.  (*Id.* ¶ 101.)

Plaintiffs allege that D.K. was arrested in September of 2020 and charged with second-degree rape and sexual assault.  (*Id.* ¶¶ 99-100.)  The public Maryland Judiciary Case Search website at http://casesearch.courts.state.md.us shows that, on April 12, 2021, D.K. pled guilty in the Circuit Court for Baltimore County, Maryland to two misdemeanors, sexual offense in the fourth degree and assault in the second degree.  *See State v. D.K.*, Case No. C-03-CR-20-002741 (Circuit Court for Baltimore County, filed Oct. 5, 2020).  On May 11, 2021, he was sentenced to three years of probation.  *Id.*

Plaintiffs allege that, even after informing CPS of the charges filed against D.K., the school took no action against D.K. or against the two boys who allegedly lied to CPS about when they were dropped off.  (*Id.* ¶¶ 102-103.)  D.K. allegedly left CPS of his own volition at the end of the school year to complete high school elsewhere.  (*Id.* ¶ 104.)  As a result of H.C.'s experience at CPS, Plaintiffs allege that H.C. began to experience anxiety and depression and has undergone mental health treatment to process the trauma of the assault.  (*Id.* ¶¶ 111-115.)  H.C. also transferred to a new school.  (*Id.*)

## V.    Plaintiff Gomez

Plaintiff Ms. Gomez was fifteen years old in 2017 when she enrolled at CPS as a ninth-grade student.  (Case No. RDB-20-3267, Am. Compl. ¶ 10, ECF No. 26.)  In the fall of 2017, Ms. Gomez alleges that male student-athletes at CPS began to verbally harass her on campus, "cat-calling" her in hallways and in classes within earshot of teachers and administrators.  (*Id.*

¶¶ 49-51.) Several male students would allegedly make comments to Ms. Gomez, within earshot of faculty members, expressing a desire to have sex with her or describing her body as being "ripe for sexual intercourse and sexual favors." (*Id.* ¶ 52.) Ms. Gomez alleges that none of the adults at CPS who overheard these comments ever reprimanded the students for these comments or reported their conduct. (*Id.* ¶ 54.)

In or around late fall of 2017, Ms. Gomez alleges that she was hanging out with friends on campus after school and before a CPS sporting event. (*Id.* ¶ 57.) At some point, one of her male acquaintances allegedly picked her up and threw her over his shoulder. (*Id.* ¶ 59.) When Ms. Gomez demanded that the boy put her down, he allegedly refused and held her legs tighter against his body with one arm and spanked Ms. Gomez's backside with his free hand. (*Id.* ¶¶ 60-61.) She alleges that a group of male student-athletes witnessed this incident and proceeded to "join in," grabbing Ms. Gomez's backside and thighs and spanking her aggressively. (*Id.* ¶ 62.) Ms. Gomez was allegedly extremely upset by this incident and expressed her discomfort to her boyfriend and her friends. (*Id.* ¶ 63.)

Ms. Gomez alleges she later reported the assault to CPS's Headmaster, Brent Johnson, and to CPS's guidance counselor, Kim Grill, but that no action was taken with respect to any of the assailants and that the alleged sexual assault was not reported to authorities. (*Id.* ¶ 64.) She also confided in CPS's Dean of Students and middle school principal, Curtis Miller, who allegedly encouraged her to come to him when she experienced harassment but did not take any steps to further investigate or report the harassment. (*Id.* ¶¶ 65-66.) Ms. Gomez also alleges that her boyfriend, an alumnus of CPS, contacted CPS several times about the

harassment. (*Id.* ¶ 67.) Nevertheless, Ms. Gomez alleges she was verbally harassed throughout her freshman year. (*Id.* ¶ 68.)

In the fall of 2018, Ms. Gomez asserts the verbal harassment from the male student-athletes intensified, with the students telling her that they wanted to have sex with and impregnate her. (*Id.* ¶¶ 69-70.) In or around the spring of 2018, Ms. Gomez alleges that a fellow student, "S", repeatedly told her "I want to have sex with you," and made these comments in front of their religion teacher, Sue Welinsky, who allegedly ignored the comments. (*Id.* ¶¶ 72-73.) Ms. Gomez reported the comments to both Mr. Miller and to Ms. Welinsky. (*Id.* ¶¶ 74-75.) Ms. Welinsky allegedly asked "S" if he made those comments and he "flippantly responded that he did, and stood by his sexual proposition to Ms. Gomez." (*Id.* ¶ 76.) Ms. Welinsky then sent both Ms. Gomez and "S" to Mr. Johnson's office, who allegedly told them to spend a week at home to "allow the situation to resolve itself." (*Id.* ¶ 77.)

Meanwhile, Ms. Gomez alleges she accompanied 6-8 different CPS female students to meetings with CPS administration so that these students could report sexual harassment they had also experienced, but neither CPS nor LCMS took action with respect to these reports. (*Id.* ¶¶ 79-81.) CPS did allegedly bring in a speaker during the spring of 2018 to discuss date rape and sexual assault. (*Id.* ¶ 82.) However, Ms. Gomez alleges this presentation lasted only 30 minutes, was poorly attended by faculty and administrators, and was not taken seriously by the CPS students. (*Id.* ¶¶ 83-84.) Based on her experience at CPS, Ms. Gomez began to exhibit symptoms of anxiety and depression and has undergone mental health treatment. (*Id.* ¶¶ 89-98.) She has also transferred to a new school. (*Id.* ¶ 96.)

VI.    **Plaintiff A.G.**

A third minor, A.G., through her mother, Ms. Barber, also alleges that she was sexually and verbally harassed by another CPS student, for which CPS failed to take any action. (Case No. RDB-21-0691, Compl. ¶¶ 63-108, ECF No. 1.) A.G. enrolled in the sixth grade at CPS in 2016 when she was eleven years old. (*Id.* ¶ 9.) While visiting CPS prior to enrollment, A.G. alleges she met a seventh-grade CPS student, "W." (*Id.* ¶ 64.) She alleges that when she began school in 2016 at CPS, "W" began verbally harassing her in hallways, the lunchroom, and in the band room. (*Id.*) Despite A.G.'s mother, Ms. Barber, reporting this alleged "bullying" to then-middle school principal, Ruth Heilman, it continued unabated throughout the school year, with "W" threatening A.G. through social media with physical and sexual violence. (*Id.* ¶¶ 65-66.) In or around April of 2017, Ms. Barber allegedly sent an email of these threatening messages to Curtis Miller, the new middle school principal, and asked for a meeting to discuss the issue. (*Id.* ¶ 67.) Neither Ms. Heilman or Mr. Miller took action to address or mitigate the threats and bullying against A.G. (*Id.* ¶¶ 65-88.)

In or around late April of 2017, "W" and his friends allegedly followed A.G. from her locker after school, taunting her and making threats to harm her within earshot of three faculty members. (*Id.* ¶ 69.) A.G. alleges that "W" and his friends attempted to intimidate A.G. by throwing their backpacks on the ground, stepping into A.G.'s personal space, telling her that they would "beat her up," and using threatening language about A.G.'s appearance, race, and body. (*Id.* ¶¶ 70-71.) A.G. allegedly ran to the administration office and "W" pursued her, shouting that she was a "snitch" and continuing to threaten her. (*Id.* ¶¶ 72-73.) Meanwhile, Ms. Barber alleges she had been waiting to pick up A.G. from school but became concerned when A.G. was not in the parking lot. (*Id.* ¶ 74.) Ms. Barber allegedly found A.G. in Mr.

Miller's office where A.G. voiced her concerns to him about the altercation with "W" and his friends. (*Id.* ¶¶ 75-76.) Mr. Miller allegedly took no action to curb the bullying and threats from "W" and his friends, which continued into the next year of school. (*Id.* ¶¶ 77-78.)

In or around March of 2018, A.G. alleges that another male student at CPS, "J," pushed her after lunch and kept his hands on her body to block her from moving beyond him in the hallway, an incident that was witnessed by A.G.'s science teacher. (*Id.* ¶ 82.) A.G. alleges she pushed "J" off of her, after which A.G.'s teacher grabbed A.G. by the jacket and reprimanded her. (*Id.* ¶ 83.) Both "J" and A.G. were punished for this interaction. (*Id.* ¶ 84.) "J"'s bullying, however, allegedly continued into the fall of 2018. (*Id.* ¶ 85.)

On or about September 27, 2018, A.G. alleges that "J" assaulted her on two different occasions during the school day, forcibly striking her on the back and punching her in her windpipe. (*Id.* ¶ 86.) On or about September 30, 2018, Ms. Barber emailed Mr. Miller about the alleged assaults and about "J's" prior history of alleged assaultive conduct on A.G. (*Id.* ¶ 87.) Mr. Miller allegedly never responded to Ms. Barber's email. (*Id.* ¶ 88.) Ms. Barber and A.G. allege that A.G. began to receive infractions at school for A.G.'s behavior, including spending "too long" in the bathroom, using her cell phone during the day, and increased absenteeism. (*Id.* ¶¶ 89-94.) A.G. alleges that when she missed school due to illness and a death in the family, Mr. Miller told her that these excuses were "pathetic" and threatened to call a "truancy officer" if she continued to miss school. (*Id.* ¶ 94.) A.G. allegedly began to receive consistent lunch and Saturday detentions every week. (*Id.* ¶¶ 96-97.)

On or about February 14, 2019, Ms. Barber wrote to Mr. Miller, requesting that all future meetings between Mr. Miller and A.G. take place with Ms. Barber present. (*Id.* ¶ 98.)

On or about February 21, 2019, Ms. Barber wrote to CPS's Headmaster, Brent Johnson, regarding Mr. Miller's alleged retaliatory conduct against A.G, and to Sally Hiller, LCMS's Executive Director for Congregational Outreach and District Operations, regarding the ongoing issues at CPS. (*Id.* ¶¶ 99-100.) On or about March 14, 2019, Ms. Barber met with Mr. Johnson about Mr. Miller, and followed up with a letter requesting that A.G.'s infractions be stricken from her record. (*Id.* ¶¶ 101-102.) Plaintiffs allege, however, that Mr. Miller continued to meet with A.G. privately and to make hostile comments towards her. (*Id.* ¶ 103.) On or about May 22, 2019, Ms. Barber contacted Mr. Johnson and Ms. Hiller again, reiterating her request that Mr. Miller no longer hold private meetings with her daughter. (*Id.* ¶ 104.) Ms. Barber alleges that Ms. Hiller responded on behalf of herself and Mr. Johnson, stating that Ms. Barber's concerns "had been addressed." (*Id.* ¶ 105.) Plaintiffs maintain that these concerns were never addressed. (*Id.* ¶¶ 106-108.)

As a result of A.G.'s experience at CPS, Plaintiffs allege that A.G. began to experience anxiety and depression and has undergone mental health treatment. (*Id.* ¶¶ 109-115.) A.G. also transferred to a new school. (*Id.* ¶¶ 112, 114.)

## VII.    Procedural Background

On October 28, 2020, Plaintiff N.H., through her mother Donna Buettner-Hartsoe, filed suit against CPS in this Court. (Case No. RDB-20-3132.) On November 5, 2020, Plaintiff Pullen filed suit against CPS and LCMS. (Case No. RDB-20-3214.) On November 6, 2020, Plaintiff H.C., through her mother Andrea Conrad, filed suit against CPS and LCMS. (Case No. RDB-20-3229.) On November 11, 2020, Plaintiff Gomez filed suit against CPS and

LCMS. (Case No. RDB-20-3267.) On March 18, 2021, Plaintiff A.G., through her mother Selena Barber, filed suited against CPS. (Case No. RDB-21-0691.)

On May 18, 2021, all of these cases were assigned to the undersigned Judge. Plaintiffs allege the same six Counts: a violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.* (Count I); negligent supervision and retention (Count II); negligence (Count III); premises liability (Count IV); intentional infliction of emotional distress (Count V); and negligent infliction of emotional distress (Count VI). In Case Numbers RDB-20-3132, RDB-20-3214, RDB-20-3229, and RDB-20-3267, Defendant CPS has filed Motions for Judgment on the Pleadings. (Case No. RDB-20-3132, ECF No. 34; Case No. RDB-20-3214, ECF No. 36; Case No. RDB-20-3229, ECF No. 38; Case No. RDB-20-3267, ECF No. 79.) In Case Number RDB-21-0691, Defendant CPS has filed a Motion to Dismiss Counts I, II, IV, V, and VI. (Case No. RDB-21-0691, ECF No. 9.) In Case Numbers RDB-20-3229 and RDB-20-3267, Defendant LCMS has filed Motions to Dismiss. (Case No. RDB-20-3229, ECF No. 37; Case No. RDB-20-3267, ECF No. 80.)

## ANALYSIS

Defendant CPS seeks partial dismissal of Plaintiffs' claims. Defendant LCMS seeks dismissal of all of Plaintiffs' claims, arguing that this Court does not have subject matter jurisdiction and that Plaintiffs have failed to state claims for relief. In their respective Opposition briefs, Plaintiffs concede the dismissal of their claims for negligent infliction of emotional distress (Count VI) against both CPS and LCMS. (Case No. RDB-20-3132, ECF No. 45; Case No. RDB-20-3214, ECF No. 42; Case No. RDB-20-3229, ECF Nos. 46, 47; Case No. RDB-20-3267, ECF Nos. 84, 89; Case No RDB-21-0691, ECF No. 12.)

Accordingly, Plaintiffs' claims for negligent infliction of emotional distress (Count VI) will be dismissed with prejudice. Their remaining claims for violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* (Count I), negligent supervision and retention (Count II), negligence (Count III), premises liability (Count IV), and intentional infliction of emotional distress (Count V) are addressed below.

## I.     Defendant LCMS's Motions to Dismiss

### A. 12(b)(1) Motion to Dismiss

Defendant Lutheran Church-Missouri Synod challenges this Court's subject matter jurisdiction, arguing that the ecclesiastical absention doctrine prevents this Court from exercising its jurisdiction over claims asserted against LCMS, a religious organization. A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). Defendant LCMS clearly presents a facial challenge and accordingly "must show that [the] complaint fails to allege facts upon which subject matter can be predicated." *Amador v. Mnuchin*, 476 F. Supp. 3d 125, 139 (D. Md. Aug. 5, 2020) (quoting *Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018)).

The ecclesiastical abstention doctrine precludes a court's review of certain matters involving religious doctrine. As the United States Court of Appeals for the Fourth Circuit explained in *Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002):

> [T]he civil courts of our country are obliged to play a limited role in resolving church disputes. This limited role is premised on First Amendment principles that preclude a court from deciding issues of religious doctrine and practice, or from interfering with internal church government. When a civil dispute merely involves a church as a party, however, and when it can be decided without resolving an ecclesiastical controversy, a civil court may properly exercsie jurisdiction. The Courts must avoid any religious inquiry, however, and they may do so by deferring to the highest authority within the church.

However, the First Amendment "does not…remove all controversies involving religious institutions from the purview of civil courts." *Byrd v. DeVeaux*, Civil Action No. DKC-17-3251, 2019 WL 1017602, at *5 (D. Md. Mar. 4, 2019) (citing *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979); *American Union of Baptists, Inc. v. Trustees of Particular Primitive Baptist Church at Black Rock, Inc., et al.*, 335 Md. 564, 574 (1994)).[5] Indeed, as the Maryland Court of Appeals instructs, "[e]ach set of circumstances must be evaluated on an individual basis by the court to determine whether, under the facts of that particular case, a court would be forced to wander into the 'theological thicket' in order to render a decision." *American Union of Baptists, Inc.*, 335 Md. at 574.

---

[5] The parties do not dispute that Maryland law applies here, where the basis for jurisdiction is a federal question and where this Court may exercise supplemental jurisdiction over the state tort claims. *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising…supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state."); *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726 (2010) (For tort claims, Maryland applies the law of the state where the alleged harm occurred ("lex loci delicti")). There is no question that the alleged events took place in Maryland. Accordingly, the substantive tort law of Maryland governs Plaintiffs' tort claims.

This Court is satisfied that the allegations in this case do not require it to wander into the "theological thicket." The thrust of Plaintiffs H.C.'s and Gomez's claims against LCMS lie in LCMS's alleged failure to adequately address reports of sexual assault occuring at a school which it supervised and advised. Specifically, H.C. and Gomez allege that LCMS dispatched a "crisis management team" to CPS during the 2018-2019 school year to "silence the growing number of reports of assault that came forth from suvivors of abuse at CPS." (*See* Case No. RDB-20-3229, ECF No. 24 ¶¶ 47-49; Case No. RDB-20-3267, ECF No. 26 ¶¶ 45-48.) This team allegedly included Sally Hiller, the Executive Director for LCMS's Congregational Outreach and District Operations, who met with CPS faculty to institute "gag orders and quash the faculty's push for the administration to implement more stringent policies regarding sexual assault and harassment" at CPS. (*Id.*) There is simply no "theological thicket" in this case.

It is difficult for this Court to imagine how any judicial decision in this case would decide an issue of religious doctrine or practice. While LCMS argues that its relationship with CPS is "wholly religious, [] focused on fostering the mission and ministry of the Lutheran Church," and that it is not "one of oversight and control of CPS's day-to-day operational matters," this is a factual argument not suited for the dismissal stage. Plaintiffs H.C. and Gomez allege that LCMS sent a "team" to CPS to address the issues of sexual assault and harrassment, which Plaintiffs also allege was wholly inadequate. These allegations are sufficient for the Court to find that the alleged failure in LCMS's oversight of CPS's handling of sexual assault and harassment matters does not implicate an "ecclesiastical controversy," rendering this Court's exercise of subject matter jurisdiction over claims against LCMS in this

case proper. *See Goodman v. Archbishop Curley High School, Inc.*, 149 F. Supp. 3d 577, 586-88 (D. Md. 2016) (allowing plaintiff's employment retaliation claim to survive religious organizations' dismissal motion and proceed under the *McDonnell Douglas* framework because an "employer's assertion of a religious motive does not prevent a court from asking whether that motive was in fact a pretext" for discrimination); *Edley-Worford v. Virginia Conference of United Methodist Church*, 430 F. Supp. 3d 132, 138 (E.D. Va. 2019) (denying 12(b)(1) motion based on ecclesiastical abstention doctrine because plaintiff's employment discrimination claims were "not purely and strictly ecclesiastical").

Accordingly, Defendant LCMS's Motion to Dismiss for lack of subject matter jurisdiction is DENIED.

### B. 12(b)(6) Motion to Dismiss

LCMS argues that, even if this Court has subject matter jurisdiction over Plaintiffs' claims, Plaintiffs nonetheless fail to state claims for relief. Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d

435, 439 (4th Cir. 2012) (citation omitted).  In *Twombly*, the Supreme Court articulated "[t]wo

working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss.

*Iqbal*, 556 U.S. at 678.  First, while a court must accept as true all factual allegations contained

in the complaint, legal conclusions drawn from those facts are not afforded such deference.

*Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359,

365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable

to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted

inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief."  *Iqbal*,

556 U.S. at 679.

### C.  Discussion

Plaintiffs H.C. and Gomez assert claims of negligence, negligent supervision and

retention, and intentional infliction of emotional distress against Defendant LCMS.

### 1.  Negligent supervision and retention (Count II)

Plaintiffs H.C. and Gomez allege both general negligence and negligent supervision

and retention against LCMS.  In Maryland, "[t]he tort of negligent selection, training, or

retention, like any negligence action, requires the plaintiff to prove the existence of four

elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty;

(3) the plaintiff suffered actual injury; and (4) the injury proximately resulted" from that breach.

*Jones v. Family Health Ctrs. of Baltimore, Inc.*, 135 F. Supp. 3d 372, 381 (D. Md. 2015) (quoting

*Jones v. State*, 425 Md. 1, 38 A.3d 333, 343 (Md. Ct. App. 2012)).

The thrust of LCMS's dismissal argument is that LCMS did not owe a duty to Plaintiffs H.C. and Gomez. "Although there is generally no duty to protect others from third parties' conduct, such a duty may arise in the presence of a special relationship." *Doe v. Bd. of Educ. of Prince George's County*, 888 F. Supp. 2d 659, 669 (D. Md. 2012) (citing *Rhaney v. Univ. of Md. E. Shore*, 388 Md. 585, 880 A.2d 357, 364 (2005)). Indeed, this Court has previously determined that "[i]n certain circumstances, a special relationship exists between a school district and its students." *Id.* (citing *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 993 (4th Cir. 1990) ("schools and the students enjoy a special relationship of trust")). The Court reasoned that the rule "owes no small part to the fact that, as a general matter, school districts assume significant responsibility for the 'welfare and guidance' of children within their purview." *Id.* (citing *Resetar v. State Bd. of. Ed.*, 284 Md. 537, 399 A.2d 225, 242 (1979)). Accordingly, it is not the case, as LCMS suggests, that there can be no duty or "special relationship" created between a student and her school's supervising entity, whether that be a school board or a religious governing body, as here.

In this case, Plaintiffs H.C. and Gomez have sufficiently alleged that LCMS owed them a duty as students of a parochial school, CPS, over which LCMS allegedly accredited and supervised, and to which LCMS allegedly provided funding and training. (Case No. RDB-20-3229, ECF No. 24 ¶¶ 5, 14, 128-138; Case No. RDB-20-3267, ECF No. 26 ¶¶ 3, 13-14, 111-112.) Plaintiffs also sufficiently plead the remaining elements of breach, injury, and causation. They allege that LCMS breached its duty by retaining Sally Hiller in a position of authority despite her alleged failure to adequately address Plaintiffs H.C. and Gomez's multiple allegations of sexual harassment and assault. (Case No. RDB-20-3229, ECF No. 24 ¶¶ 48-49;

Case No. RDB-20-3267, ECF No. 26 ¶¶ 46-47.) Specifically, they allege that Sally Hiller, LCMS's Executive Director for Congregational Outreach and District Operations, met with faculty on several occasions during the 2018-2019 school year "to institute intimidating gag orders and quash the faculty's push for the administration to implement more stringent policies concerning sexual assault and harassment." (Case No. RDB-20-3229, ECF No. 24 ¶¶ 43-50; Case No. RDB-20-3267, ECF No. 26 ¶¶ 41-48.) Plaintiff Gomez alleges her sexual harassment and assault occurred in 2017 and 2018, while Plaintiff H.C. was sexually assaulted in 2019. (Case No. RDB-20-3229, ECF No. 24 ¶¶ 55-90; Case No. RDB-20-3267, ECF No. 26 ¶¶ 57-77.) Both Plaintiffs allege that, because of Ms. Hiller's alleged failures, on behalf of LCMS, to address reports of sexual assault and harassment, whether Plaintiffs' own or others, Plaintiffs H.C. and Gomez continued to endure sexual harassment at CPS, experienced anxiety and depression, underwent mental health treatment, and transferred to different schools. (Case No. RDB-20-3229, ECF No. 24 ¶¶ 137-138; Case No. RDB-20-3267, ECF No. 26 ¶¶ 120-121). Accordingly, Plaintiffs H.C. and Gomez have stated a claim for negligent supervision and retention against LCMS.

## 2. Negligence (Count III)

Plaintiffs H.C. and Gomez also allege that LCMS was generally negligent in its handling of their sexual assault and harassment complaints. As with negligent supervision and retention, a negligence claim requires alleging a duty owed to plaintiff that defendant breached, and that such breach proximately caused injury to the plaintiff. *See McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 104-05 (D. Md. 2010) (citing *Jacques v. First Nat'l Bank of Md.*, 515 A.2d. 756 (Md. 1986)). As explained above, Plaintiffs have sufficiently alleged that LCMS owed

them a duty.  Plaintiffs H.C. and Gomez have also sufficiently alleged the remaining elements of a general negligence claim, asserting that LCMS, directly involved in supervising the policies and practices of CPS, failed to adequately address Plaintiffs' constant reports of sexual assault and harassment, resulting in further harassment and emotional anguish.    The Court finds these allegations sufficient to state a claim of negligence against LCMS.  *See, e.g.*, *Doe v.. Bd. of Educ. of Prince George's County*, 888 F. Supp. 2d at 669 (denying motion to dismiss negligence claim against school board for classmate's harassment of plaintiff student).

### 3.  Intentional infliction of emotional distress (Count V)

To plead intentional infliction of emotional distress ("IIED") under Maryland law, "a plaintiff must allege: (1) that the conduct in question was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there was a causal connection between the conduct and the emotional distress; and (4) that the emotional distress was severe." *McPherson v. Baltimore Police Department*, 494 F. Supp. 3d 269, 286 (D. Md. Oct. 14, 2020) (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). As this Court noted in *Arsham v. Mayor & City Council of Baltimore*, "[t]he tort of IIED 'is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct...of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'" 85 F. Supp. 3d 841, 849 (D. Md. 2015) (quoting *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8 (Md. 1992)).

Plaintiffs fail to plead a claim for intentional infliction of emotional distress against LCMS.  Although Plaintiffs allege negligent conduct by LCMS resulting in emotional trauma, including grief and anxiety, there are no specific allegations that LCMS acted intentionally or even recklessly to cause Plaintiffs' emotional distress.  Nor do the allegations that LCMS failed

to undertake and implement the appropriate procedures in response to sexual assault and harassment claims rise to the level of "extreme and outrageous" conduct required to state an IIED claim. Beyond their conclusory allegations that LCMS's conduct was "so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community," Plaintiffs do not provide any particularly outrageous or atrocious examples of such conduct. (*Id.* ¶¶ 142-145.)

Accordingly, Plaintiffs H.C. and Gomez's claims for intentional infliction of emotional distress against LCMS (Counts V) are DISMISSED WITH PREJUDICE.[6] As discussed below, however, all of the Plaintiffs' claims against CPS as to their Counts for intentional infliction of emotional distress shall survive because Plaintiffs have sufficiently alleged such outrageous and extreme conduct by CPS and its administrators in the face of widespread allegations of sexual assault and harassment.

## II. Defendant CPS's Motions for Judgment on the Pleadings and Motion to Dismiss

### A. 12(b)(6) and 12(c) Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure authorizes a party to move for judgment on the pleadings any time after the pleadings are closed, as long as it is early enough not to delay trial.[7] *See* Fed. R. Civ. P. 12(c). The legal standard governing such a motion is

---

[6] Plaintiffs ask the Court to allow amendment for any claims that may fail. Such amendment would be futile, however, as the thrust of Plaintiffs' claims against LCMS lie in its alleged negligence. Plaintiffs claims for IIED against CPS, however, are distinguishable and are addressed *infra*.

[7] Defendant CPS filed an Answer in each case in December, 2020, prior to filing its Motions for Judgment on the Pleadings. (Case No. RDB-20-3132, ECF No. 8; Case No. RDB-20-3214, ECF No. 8; Case No. RDB-20-3229, ECF No. 7; Case No. RDB-20-3267, ECF No. 8.) On May 18, 2021, CPS filed an Answer in Case Number RDB-21-0691 the same day it filed its Motion to Dismiss. (Case No. RDB-21-0691, ECF No. 9.) Trial has yet to be set in any of these cases.

the same as a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999); *Booker v. Peterson Cos.*, 412 F. App'x 615, 616 (4th Cir. Feb.25, 2011); *Economides v. Gay*, 155 F. Supp. 2d 485, 488 (D. Md. 2001). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

In determining whether dismissal is appropriate, this Court assumes as true all well-pleaded facts in the plaintiff's complaint but does not accept the plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Simmons v. United Mort. & Loan Invi, LLC*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009). In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679.

### B. Discussion

CPS seeks dismissal and/or a judgment on the pleadings of all of Plaintiffs' claims for negligent supervision and retention (Count II), premises liability (Count IV), and intentional

infliction of emotional distress (Count V).  However, CPS seeks dismissal and/or a judgment on the pleadings of only Plaintiffs H.C., Gomez, and A.G.'s claims under Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.* (Count I).

1.  **Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* (Count I)**

CPS seeks dismissal of Plaintiff A.G.'s claim under Title IX and seeks judgment on the pleadings as to Plaintiffs H.C. and Gomez's claims under Title IX.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that sexual harassment and sexual assault may constitute unlawful sex discrimination. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).

As both the Supreme Court and the Fourth Circuit has recognized, "a covered institution can be liable under Title IX" if a plaintiff can show that school officials were (1) "deliberately indifferent to sexual harassment"; (2) "of which they [had] actual knowledge"; (3) "that is so severe, pervasive, and objectively offensive"; and (4) "that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650; *Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018).  School officials are put on notice when "incidents of student-on-student harassment are repeatedly reported to those officials with authority to take remedial action." *Miller v. Union County Public Schools*, No. 3:16-cv-0666-FDW-DCK, 2017 WL 3923977, at *5 (W.D.N.C. Sept. 7, 2017) (citing *Doe v. Bd. of Educ. of Prince George's County*, 888 F. Supp. 2d 659, 667 (D. Md. 2012)).

Plaintiffs H.C., Gomez, and A.G. allege that CPS was deliberately indifferent to their sexual assault and harassment complaints in violation of their rights under Title IX. Each of these Plaintiffs allege specific instances of sexual assault and/or harassment by fellow CPS students, which are sufficiently severe, pervasive, and objectively offensive. In addition, Plaintiffs H.C., Gomez, and A.G. adequately allege that CPS had actual knowledge of such incidents but was deliberately indifferent to them in failing to adequately address the allegations.[8]

Plaintiff H.C. alleges that, throughout her eighth-grade year, she repeatedly received sexually harassing socially media messages from fellow male student, D.K., and that her family received a contact submission from a computer allegedly registered to CPS, referring to H.C. as "H. Cumrag." (Case No. RDB-20-3229, Am. Compl. ¶¶ 51-69, ECF No. 24.) She alleges that this behavior was consistently reported to CPS administration, including to CPS's Director of Admissions Stephen Berger, Headmaster Brent Johnson, Guidance Counselor Kim Grill, and Middle School Principal Curtis Miller, but that none of these faculty members did anything to address the allegations and concerns. (*Id.* ¶¶ 55-66, 95-96, 102.) Consequently, H.C. alleges that, based on CPS's failure to address her concerns over D.K.'s conduct, H.C. was digitally raped by D.K. after a school event. (*Id.* ¶¶ 70-89.) After this alleged assault, H.C. alleges that Headmaster Brent Johnson would not pursue an investigation unless criminal

---

[8] It should be noted that, on June 16, 2021, the Fourth Circuit issued an opinion addressing Title IX and the standard required to demonstrate a school's knowledge of sexual assault and harassment. *Jane Doe v. Fairfax County School Board*, No. 19-2203 (4th Cir. June 16, 2021). Specifically, the Fourth Circuit ordered a new trial on plaintiff's Title IX claim for alleged sexual assault by a fellow student because a "school's receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice or knowledge under Title IX—regardless of whether school officials subjectively understood the report to allege sexual harassment or whether they believed the alleged harassment actually occurred." *Id.* at *7-8. While *Doe v. Fairfax County*'s holding does not affect this case at this juncture, it most certainly provides guidance for this Court in these cases.

charges were brought against D.K. (*Id.* ¶ 97.) It was allegedly H.C. and her family who reported the assault to the police, not CPS, and D.K. was ultimately convicted of sexual offense in the fourth degree and assault in the second degree. (*Id.* ¶¶ 98-100; *See State v. D.K.*, Case No. C-03-CR-20-02741 (Circuit Court for Baltimore County, filed Oct. 5, 2020).)

Plaintiff Gomez alleges that male student-athletes at CPS verbally harassed her on campus, "cat-calling" her in hallways within earshot of teachers and administrators, and expressing a desire to have sex with her or describing her body as "ripe for sexual intercourse." (Case No. RDB-20-3267, Am. Compl. ¶¶ 49-52, ECF No. 26.) On one occasion on campus, Ms. Gomez was allegedly picked up and thrown over the shoulder of a male student, who ignored her requests to put her down, and spanked her backside. (*Id.* ¶¶ 57-61.) She alleges that a group of male students proceeded to "join in," spanking her aggressively. (*Id.* ¶ 62.) After allegedly reporting this incident to Brent Johnson and Kim Grill, neither CPS administrator took any action with respect to any of the assailants and the incident was never reported to authorities. (*Id.* ¶¶ 64-66.) The following year, Ms. Gomez alleges she was again verbally sexually harassed by several male CPS students, one of whom told her repeatedly, in front of their religion teacher, Sue Welinsky, that he wanted to have sex with Ms. Gomez. (*Id.* ¶¶ 69-75.) Ms. Welinsky sent both Ms. Gomez and the male student to Brent Johnson's office who told them both to spend a week at home to "allow the situation to resolve itself." (*Id.* ¶¶ 76-77.)

Plaintiff A.G. alleges that she was consistently verbally and sexually harassed by a fellow CPS student throughout her sixth-grade year. (Case No. RDB-21-691, Compl. ¶¶ 63-108, EF No. 1.) Specifically, a male student, "W," allegedly threatened A.G. with physical and sexual

violence, which A.G.'s mother reported to the principals of the Middle School, Ruth Heilman and Curtis Miller. (*Id.* ¶¶ 65-68.) Neither administrator took any action, and "W" allegedly continued to intimidate A.G, including telling her he would "beat her up," and using threatening language about her race, appearance, and body. (*Id.* ¶¶ 69-73.) The following year, another male student, "J", allegedly physically assaulted A.G. on campus on several occasions, striking her on her back and punching her in her windpipe, both of which were reported to Mr. Miller. (*Id.* ¶¶ 83-88.) Instead of addressing A.G.'s concerns, A.G. alleges that Mr. Miller began to discipline A.G. for spending "too long" in the bathroom, using her cell phone, and her increased absenteeism. (*Id.* ¶¶ 89-94.) In response to A.G.'s explanations of personal illness and a family death, Mr. Miller told her that the excuses were "pathetic" and threatened to call a truancy officer if she continued to miss school. (*Id.* ¶¶ 95-97.)

While CPS aptly notes that Plaintiffs' claims of harassment must "take place in a context subject to the school's control" to be actionable, each Plaintiff has alleged such pervasive harassment that occurred on CPS's campus and/or within CPS's control. *See Borkowski v. Baltimore City*, 414 F. Supp. 3d 788, 820 (D. Md. 2019). H.C. alleges constant sexual harassment by a fellow student at school, and that a CPS-registered computer was used to submit a sexually harassing message to H.C.'s family business. Ms. Gomez alleges she was repeatedly spanked by several male students on campus, and the following year was verbally sexually harassed by several students in front of her religion teacher, who took no action. A.G. alleges she was assaulted by a male student several times on campus, striking her in her back and punching her in her windpipe. Even if certain instances of harassment or assault occurred

off-campus, the Court is satisfied that Plaintiffs have alleged sufficient severe, pervasive, and objectionable conduct that occurred at CPS.

In each case, these three women allege that they were subjected to sexual harassment, ranging from verbal to physical assault, and they have named specific CPS administrators who they allege possessed actual knowledge about this harassment but who took no action. Moreover, each of these students allege they had to complete their education elsewhere because of their experiences, which suffices at this juncture to show that they were denied access to the educational opportunities or benefits provided by the school. All of these allegations are more than sufficient for Plaintiffs H.C., Gomez, and A.G. to state claims for relief under Title IX. *See, e.g., Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 693 (4th Cir. 2018) (vacating district court's dismissal of Title IX claim, finding plaintiff's allegations of harassment on social media, used on campus, stated a claim under Title IX); *Doe v. Bd. of Educ. of Prince George's County*, 888 F. Supp. 2d 659, 667 (D. Md. 2012) (denying motion to dismiss Title IX claim when student forced plaintiff to touch his genitalia at school, in addition to allegations of lewd remarks); *Miller v. Union County Public Schools*, No. 3:16-cv-0666-FDW-DCK, 2017 WL 3923977, at *5 (W.D.N.C. Sept. 7, 2017) (denying motion to dismiss Title IX claim).

### 2. Negligent supervision and retention (Count II)

As explained above, a claim for negligent supervision and retention, "like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted" from that breach. *Jones v. Family Health Ctrs. of Baltimore, Inc.*, 135 F. Supp. 3d 372, 381 (D. Md. 2015) (quoting *Jones v. State*, 425

Md. 1, 38 A.3d 333, 343 (Md. Ct. App. 2012)). Specifically, a plaintiff must establish "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, [supervising], or retaining employee as the approximate cause of plaintiff's injuries." *Jarvis v. Securitas Sec. Services USA, Inc.*, Civil Action No. 11-cv-00654-AW, 2012 WL 527597, at *5 (D. Md. Feb. 16, 2012) (quoting *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 198 Md. App. 254, 17 A.3d 155, 165 (Md. Ct. Spec. App. 2011)).

CPS argues that Plaintiffs have failed to identify which CPS employees were improperly trained, supervised, or retained, and that Plaintiffs fail to allege CPS's actual or constructive knowledge of any incompetence by an employee. However, each Plaintiff has indeed identified specific CPS employees who had knowledge of Plaintiffs' sexual harassment and/or assault allegations, and they allege that, despite their continued reports and complaints to CPS Administration and to CPS's board, no action was taken with regard to those employees.

Plaintiff N.H. alleges that a video depicting her masturbating was circulated throughout CPS, without her knowledge or consent, and that CPS's Guidance Counselor, Ms. Grill held a meeting with N.H. about the video. (Case No. RDB-20-3132, Compl. ¶¶ 38-43, ECF No. 1.) Ms. Grill did not, however, inform N.H.'s parents or otherwise report the video to authorities. (*Id.*) N.H. alleges she was later sexually assaulted while in class by a male student who stuck his hand up her skirt during class. (*Id.* ¶¶ 49-50.) When N.H. told Ms. Grill and the assistant principal, Mr. Miller, about the incident, neither employee took action, and the verbal and physical harassment allegedly continued. (*Id.* ¶¶ 50-52.) Later that year, N.H. was

again allegedly sexually assaulted in the locker room by a group of male students, who barricaded her into the back of the locker room and attempted to digitally rape her. (*Id.* ¶¶ 53-56.) N.H. alleges she reported the incident to CPS administration, but again no action was taken. (*Id.*)

Plaintiff Ms. Pullen alleges that, after experiencing repeated instances of verbal sexual harassment from members of CPS's male soccer team, she reported the harassment to her teacher and cheerleading coach, Sue Welinsky, who told Ms. Pullen she would take care of it and "everything would be fine." (Case No. RDB-20-3214, Compl. ¶¶ 48-59, ECF No. 1.) In addition to reporting to Ms. Welinsky, Ms. Pullen and her mother, who was also a teacher at CPS, reported the harassment to Brent Johnson, who allegedly told them to "leave it alone" and discouraged Ms. Pullen from reporting any further conduct. (*Id.* ¶¶ 60-63.) Later that year, Ms. Pullen alleges she was sexually assaulted by a male CPS student who grabbed her arm in class and forced her hand against his clothed penis. (*Id.* ¶ 69.) Again, Ms. Pullen reported the assault to Ms. Welinsky and another male student reported it to CPS administrators. (*Id.* ¶¶ 70-72.) While Ms. Pullen was questioned about the assault for a week, she maintains that no disciplinary action was taken with respect to any of the alleged assailants. (*Id.* ¶¶ 80-83.) Following the incident, Ms. Pullen alleges that Mr. Johnson suspended her for jeopardizing the male soccer players' athletic scholarships and warned her that if she continued do so, then he would inform her new school of her suspension. (*Id.* ¶¶ 86-88.)

Plaintiff H.C. alleges that, throughout her eighth-grade year, she repeatedly received sexually harassing socially media messages from fellow male student, D.K., and that her family received a contact submission from a computer allegedly registered to CPS, referring to H.C.

as "H. Cumrag." (Case No. RDB-20-3229, Am. Compl. ¶¶ 51-69, ECF No. 24.) She alleges that this behavior was consistently reported to CPS administration, including to CPS's Director of Admissions Stephen Berger, Headmaster Brent Johnson, Guidance Counselor Kim Grill, and Middle School Principal Curtis Miller, but that none of these faculty members did anything to address the allegations and concerns. (*Id.* ¶¶ 55-66, 95-96, 102.) H.C. was later digitally raped by D.K. after a school event. (*Id.* ¶¶ 70-89.) After this alleged assault, H.C. alleges that Brent Johnson would not pursue an investigation unless criminal charges were brought against D.K. (*Id.* ¶ 97.) It was allegedly H.C. and her family who reported the assault to the police, not CPS, and D.K. was ultimately convicted of sexual offense in the fourth degree and assault in the second degree. (*Id.* ¶¶ 98-100; *See State v. D.K.*, Case No. C-03-CR-20-02741 (Circuit Court for Baltimore County, filed Oct. 5, 2020).)

Plaintiff Gomez alleges that male student-athletes at CPS verbally harassed her on campus, "cat-calling" her in hallways within earshot of teachers and administrators, and expressing a desire to have sex with her or describing her body as "ripe for sexual intercourse." (Case No. RDB-20-3267, Am. Compl. ¶¶ 49-52, ECF No. 26.) On one occasion on campus, Ms. Gomez was allegedly picked up and thrown over the shoulder of a male student, who ignored her requests to put her down, and spanked her backside. (*Id.* ¶¶ 57-61.) She alleges that a group of male students proceeded to "join in," spanking her aggressively. (*Id.* ¶ 62.) After allegedly reporting this incident to Brent Johnson and Kim Grill, neither CPS administrator took any action with respect to any of the assailants and the incident was never reported to authorities. (*Id.* ¶¶ 64-66.) The following year, Ms. Gomez alleges she was again verbally sexually harassed by several male CPS students, one of whom told her repeatedly, in

front of their religion teacher, Sue Welinsky, that he wanted to have sex with Ms. Gomez. (*Id.* ¶¶ 69-75.) Ms. Welinsky sent both Ms. Gomez and the male student to Brent Johnson's office who told them both to spend a week at home to "allow the situation to resolve itself." (*Id.* ¶¶ 76-77.)

Plaintiff A.G. alleges that she was consistently verbally and sexually harassed by a fellow CPS student throughout her sixth-grade year. (Case No. RDB-21-691, Compl. ¶¶ 63-108, EF No. 1.) Specifically, a male student, "W," allegedly threatened A.G. with physical and sexual violence, which A.G.'s mother reported to the principals of the Middle School, Ruth Heilman and Curtis Miller. (*Id.* ¶¶ 65-68.) Neither administrator took any action, and "W" allegedly continued to intimidate A.G, including telling her he would "beat her up," and using threatening language about her race, appearance, and body. (*Id.* ¶¶ 69-73.) The following year, another male student, "J", allegedly physically assaulted A.G. on campus on several occasions, striking her on her back and punching her in her windpipe, both of which were reported to Mr. Miller. (*Id.* ¶¶ 83-88.) Instead of addressing A.G.'s concerns, A.G. alleges that Mr. Miller began to discipline A.G. for spending "too long" in the bathroom, using her cell phone, and her increased absenteeism. (*Id.* ¶¶ 89-94.) In response to A.G.'s explanations of personal illness and a family death, Mr. Miller told her that the excuses were "pathetic" and threatened to call a truancy officer if she continued to miss school. (*Id.* ¶¶ 95-97.)

All of the Plaintiffs allege that, because of various CPS employees' alleged failures, on behalf of CPS, to address reports of sexual assault and harassment, whether Plaintiffs' own or others, Plaintiffs continued to endure sexual harassment at CPS, experienced anxiety and depression, underwent mental health treatment, and transferred to different schools. In short,

all five cases are replete with allegations of negligent supervision and retention by Concordia Preparatory School. Accordingly, the Court finds that Plaintiffs have stated a claim for negligent supervision and retention against CPS.

### 3. Premises liability (Count IV)

"Premises liability is based on common-law principles of negligence ... so a plaintiff must establish the four elements required in any negligence action" to prevail. *Macias v. Summit Mgmt., Inc.*, 220 A.3d 363, 375 (Md. 2019) (citing *Troxel v. Iguana Cantina, LLC*, 29 A.3d 1038, 1038 (Md. 2011)). In Maryland, "the duty that an owner or occupier of land owes to persons entering onto the land varies according to the visitor's status as an invitee (i.e., a business invitee), a licensee by invitation (i.e., a social guest), a bare licensee, or a trespasser." *Rybas v. Riverview Hotel Corp.*, 21 F. Supp. 3d 548, 561 (citing *Baltimore Gas & Elec. Co. v. Lane*, 338 Md. 34, 44, (1995); *Wagner v.* Doehring, 315 Md. 97, 101-01 (1989; *Rowley v. Mayor of Baltimore*, 305 Md. 456, 464-65 (1986)).

A business invitee, defined as "one invited or permitted to enter another's property for purposes related to the landowner's business" warrants the highest duty owed. *Id.* (quoting *Norris v. Ross Stores, Inc.*, 159 Md. App. 323, 334 (2004)). This duty requires an owner or occupier of land to "exercise reasonable care to 'protect the invitee from injury caused by an unreasonable risk' that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care." *Id.* (quoting *Casper v. Chas. F. Smith & Son, Inc.*, 71 Md. App. 445, 582 (1987), *aff'd*, 316 Md. 573 (1989)). This duty includes "the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against

foreseeable dangers." *Id.* (citing *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388 (1997)).

Here, Defendant CPS does not seem to challenge the notion that it owed Plaintiffs a duty as business invitees. However, CPS challenges Plaintiffs' notion that a "dangerous condition" existed at CPS. Plaintiffs characterize the dangerous condition at CPS as the "toxic sexual atmosphere" of the school itself, in which male students allegedly used various spaces within the school to sexually intimidate and, in certain circumstances, sexually assault female students. While these are serious and alarming allegations, they are not suited for a premises liability claim. In Maryland, the tort of premises liability relates specifically to an injury as a result of a physical defect on property. *See Rhaney v. Univ. of Md. Eastern Shore*, 388 Md. 585, 600 (2005). In *Rhaney*, the Maryland Court of Appeals rejected a premises liability claim against a University where plaintiff was assaulted by his roommate. *Id.* The Court of Appeals explained that another student's "propensity to batter his roommate" may not be "characterized properly as a dangerous or defective condition" under Maryland law. *Id.* (citing *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 548 (2003)).

Accordingly, Plaintiffs' allegations regarding other students' conduct and CPS administrators' failures are not reflective of a defective *physical condition* of the premises.[9] While CPS owed Plaintiffs a duty, their claims of a "hyper-sexualized environment" that caused them

---

[9] While there is a lack of case law in this Circuit addressing this particular issue, federal courts in other districts (applying their respective state laws) have consistently rejected premises liability claims against schools based on allegations of bullying or sexual harassment. *See Kauhako v. State of Hawaii Bd. of Educ. Dep't of Educ.*, Civil No. 13-00567 DKW-BMK, 2015 WL 5312359, at * 9 (D. Haw. Sept. 9, 2015) (premises liability claim not viable based on allegations of sexual harassment occurring in school bathroom); *Halvorson v. Independent School Dist. No. I-007 of Oklahoma County, Okla.*, No. CIV-07-1363-M, 2008 WL 5101285, at *6 (W. D. Okla. Nov. 26, 2008) (rejecting premises liability claim because plaintiff "was not injured by 'the nature of hidden dangers, traps, snares, pitfalls and the like' as contemplated by the caselaw").

injury do not fit within the parameters of a premises liability claim under Maryland law. Moreover, the Plaintiffs' other negligence claims shall survive, which the Court finds are the more appropriate avenues for Plaintiffs' allegations. Accordingly, Plaintiffs have failed to allege premises liability against CPS, and Count IV shall be DISMISSED WITH PREJUDICE.

### 4. Intentional Infliction of Emotional Distress (Count V)

As detailed above, *supra* Section I.C.3, a claim for intentional infliction of emotional distress "'is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct...of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'" *Arsham v. Mayor & City Council of Baltimore*, 85 F. Supp. 3d 841, 849 (D. Md. 2015) (quoting *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8 (Md. 1992)). As such, "a plaintiff must allege: (1) that the conduct in question was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there was a causal connection between the conduct and the emotional distress; and (4) that the emotional distress was severe." *McPherson v. Baltimore Police Department*, 494 F. Supp. 3d 269, 286 (D. Md. Oct. 14, 2020) (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). "The intensity and duration of the [emotional] distress are factors to be considered in determining its severity." *Harris*, 380 A.2d at 615.

Although Plaintiffs fail to plead a claim for intentional infliction of emotional distress against Lutheran Church-Missouri Synod, Plaintiffs' claims against Concordia Preparatory School shall survive because Plaintiffs have sufficiently alleged such outrageous and extreme conduct by CPS and its administrators in the face of widespread allegations of sexual assault and harassment. What distinguishes Plaintiffs' claims against CPS are the detailed allegations

of specific CPS administrators and faculty ignoring and disregarding consistent and appalling reports of sexual harassment and assault by CPS students, leading to and, allegedly, contributing to their continued harassment.

Plaintiff N.H. alleges that a video depicting her masturbating was circulated throughout CPS, without her knowledge or consent, and that CPS's Guidance Counselor, Ms. Grill held a meeting with N.H. about the video. (Case No. RDB-20-3132, Compl. ¶¶ 38-43, ECF No. 1.) N.H. alleges she was later sexually assaulted while in class by a male student who stuck his hand up her skirt during class, about which she also told Ms. Grill and the assistant principal, Mr. Miller. (*Id.* ¶¶ 49-50.) Neither employee took action, and the verbal and physical harassment allegedly continued. (*Id.* ¶¶ 50-52.) Later that year, N.H. was again allegedly sexually assaulted in the locker room by a group of male students, who barricaded her into the back of the locker room and attempted to digitally rape her. (*Id.* ¶¶ 53-56.)

Plaintiff Ms. Pullen alleges that she reported repeated instances of verbal sexual harassment from members of CPS's male soccer team to her teacher and cheerleading coach, Sue Welinsky, who told Ms. Pullen she would take care of it and "everything would be fine." (Case No. RDB-20-3214, Compl. ¶¶ 48-59, ECF No. 1.) Ms. Pullen and her mother also reported the harassment to Headmaster Brent Johnson, who allegedly told them to "leave it alone" and discouraged Ms. Pullen from reporting any further conduct. (*Id.* ¶¶ 60-63.) Later that year, Ms. Pullen alleges she was sexually assaulted by a male CPS student who grabbed her arm in class and forced her hand against his clothed penis. (*Id.* ¶ 69.) Again, Ms. Pullen reported the assault to Ms. Welinsky, but she maintains that no disciplinary action was taken with respect to any of the alleged assailants (*Id.* ¶¶ 70-83.) Instead, Ms. Pullen alleges that Mr.

Johnson suspended her for jeopardizing the male soccer players' athletic scholarships and warned her that if she continued do so, then he would inform her new school of her suspension. (*Id.* ¶¶ 86-88.)

Plaintiff H.C. alleges that, throughout her eighth-grade year, she repeatedly received sexually harassing socially media messages from fellow male student, D.K., and that this behavior was consistently reported to CPS administration, including to CPS's Director of Admissions Stephen Berger, Headmaster Brent Johnson, Guidance Counselor Kim Grill, and Middle School Principal Curtis Miller, but that none of these faculty members did anything to address the allegations and concerns. (Case No. RDB-20-3229, Am. Compl. ¶¶ 51-69, 95-96, 102, ECF No. 24.) She alleges she was later digitally raped by D.K. after a school event. (*Id.* ¶¶ 70-89.) After this alleged assault, H.C. alleges that Brent Johnson would not pursue an investigation unless criminal charges were brought against D.K. (*Id.* ¶ 97.) It was allegedly H.C. and her family who reported the assault to the police, not CPS, and D.K. was ultimately convicted of sexual offense in the fourth degree and assault in the second degree. (*Id.* ¶¶ 98-100; *See State v. D.K.*, Case No. C-03-CR-20-02741 (Circuit Court for Baltimore County, filed Oct. 5, 2020).)

Plaintiff Gomez alleges that male student-athletes at CPS verbally harassed her on campus, "cat-calling" her in hallways within earshot of teachers and administrators, expressing a desire to have sex with her or describing her body as "ripe for sexual intercourse," and on one occasion on campus, she was allegedly picked up and thrown over the shoulder of a male student, who ignored her requests to put her down, and spanked her backside. (Case No. RDB-20-3267, Am. Compl. ¶¶ 49-561, ECF No. 26.) She alleges that a group of male students

proceeded to "join in," spanking her aggressively. (*Id.* ¶ 62.) After reporting this incident to Brent Johnson and Kim Grill, neither CPS administrator took any action with respect to any of the assailants and the incident was never reported to authorities. (*Id.* ¶¶ 64-66.) Ms. Gomez alleges she was again verbally sexually harassed by several male CPS students, one of whom told her repeatedly, in front of their religion teacher, Sue Welinsky, that he wanted to have sex with Ms. Gomez. (*Id.* ¶¶ 69-75.) Ms. Welinsky sent both Ms. Gomez and the male student to Brent Johnson's office who told them both to spend a week at home to "allow the situation to resolve itself." (*Id.* ¶¶ 76-77.)

Finally, Plaintiff A.G. alleges that she was consistently verbally and sexually harassed by a fellow CPS student throughout her sixth-grade year, which A.G.'s mother reported to the principals of the Middle School, Ruth Heilman and Curtis Miller. (Case No. RDB-21-691, Compl. ¶¶ 63-108, EF No. 1.) Neither administrator took any action, and "W" allegedly continued to intimidate A.G, including telling her he would "beat her up," and using threatening language about her race, appearance, and body. (*Id.* ¶¶ 69-73.) The following year, another male student, "J", allegedly physically assaulted A.G. on campus on several occasions, striking her on her back and punching her in her windpipe, both of which were reported to Mr. Miller. (*Id.* ¶¶ 83-88.) Instead of addressing A.G.'s concerns, A.G. alleges that Mr. Miller began to discipline A.G. for spending "too long" in the bathroom, using her cell phone, and her increased absenteeism. (*Id.* ¶¶ 89-94.) In response to A.G.'s explanations of personal illness and a family death, Mr. Miller told her that the excuses were "pathetic" and threatened to call a truancy officer if she continued to miss school. (*Id.* ¶¶ 95-97.)

Each Plaintiff woman, all of whom were minors at the time of the allegations, has alleged either that they reported to CPS administration and faculty the sexual harassment or assault they experienced or that a CPS faculty member was *present* when the alleged incidences occurred. The Court, accepting Plaintiffs' allegations as true, finds that Plaintiffs have adequately alleged that the repeated failure and willful ignorance, of the administrators and faculty members, to address these allegations is sufficiently extreme and outrageous to be "utterly intolerable in a civilized community." *Arsham*, 85 F. Supp. 3d at 850. These are not allegations of an isolated incident going unchecked, or one administrator failing to follow up on a report of sexual assault; instead, Plaintiffs have alleged that the same set of administrators willfully ignored Plaintiffs' complaints of sexual misconduct by male students on a consistent basis, in such a way that the misconduct was allowed to, and did, continue. *See* Restatement (Second) of Torts § 46 cmt. e (Am. L. Inst. 1975) ("The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with another, which gives him actual or apparent authority over the other, or power to affect his interests….In particular police officers, *school authorities*, landlords, and collecting creditors have been held liable for extreme abuse of their position.") (emphasis added)). This Court finds that allegations of such reckless disregard by CPS administrators and faculty for the safety of its female students suffice to meet the IIED standard at this stage.

Moreover, Plaintiffs have adequately alleged the severity of their distress as required to plead this claim, as each Plaintiff alleges she has continued to undergo mental health treatment for anxiety and depression, and that she was unable to complete her education at CPS due to the trauma she experienced there. *See Posey v. Calvert County Bd. of Educ.*, 262 F. Supp. 2d 598,

601 (D. Md. 2003) (plaintiff's alleging that she "lost sleep, suffered flashbacks, lost weight, and had to seek treatment with counselors and other medical treatment providers" sufficient at dismissal stage to state a claim for IIED).

In sum, Plaintiffs' allegations are sufficient at this stage to state a claim of intentional infliction of emotional distress against CPS. *See Arsham*, 85 F. Supp. 3d at 849-59 (allowing IIED claim to survive dismissal based on allegation that defendant employer continued to engage in discriminatory, retaliatory, and hostile behavior toward plaintiff despite knowledge of plaintiff's "expected reaction to wrongful treatment"). Such allegations of wanton disregard for Plaintiffs' safety by school administrators who were uniquely positioned to protect the very safety of these students clearly state claims for intentional infliction of emotional distress against CPS. Accordingly, Plaintiffs' claims for intentional infliction of emotional distress against CPS (Count V) shall proceed.

## CONCLUSION

For the reasons stated above, Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts II, IV, V, and VI (Case No. RDB-20-3132, ECF No. 34); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts II, IV, V, and VI (Case No. RDB-20-3214, ECF No. 36); Defendant LCMS's Motion to Dismiss (Case No. RDB-20-3229, ECF No. 37); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts I, II, IV, V, and VI (Case No. RDB-20-3229, ECF No. 38); Defendant CPS's Motion for Judgment on the Pleadings with Regard to Counts I, II, IV, V, and VI (Case No. RDB-20-3267, ECF No. 79); Defendant LCMS's Motion to Dismiss (Case No. RDB-20-3267, ECF No. 80); and Defendant CPS's Motion to Dismiss for Failure to State a Claim as to Counts I,

II, IV, V, and VI (Case No. RDB-21-0691, ECF No. 9) are DENIED generally, but GRANTED in part with respect to three claims. Specifically, Count V (intentional infliction of emotional distress) in Case Numbers RDB-20-3229 and RDB-20-3267 is DISMISSED WITH PREJUDICE AS TO DEFENDANT LCMS ONLY; and Count IV (premises liability) and Count VI (negligent infliction of emotional distress) are DISMISSED WITH PREJUDICE in all five cases.

A separate Order follows.

Dated: June 23, 2021

_____/s/_____
Richard D. Bennett
United States District Judge